# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2089

_____

Midwest Oilseeds, Inc.,　　　　　　　　　*
　　　　　　　　　　　　　　　　　　*
　　　　　　Plaintiff/Appellee,　　　　*
　　　　　　　　　　　　　　　　　　*　　Appeal from the United States
　　　　v.　　　　　　　　　　　　*　　District Court for the Southern
　　　　　　　　　　　　　　　　　　*　　District of Iowa.
Limagrain Genetics Corporation,　　　*
formerly known as Callahan　　　　*
Enterprises, Inc.,　　　　　　　　*
　　　　　　　　　　　　　　　　　　*
　　　　　　Defendant/Appellant.　　*

_____

Submitted: October 22, 2003
　　　　Filed: October 14, 2004

_____

Before BYE, HANSEN and MELLOY, Circuit Judges.

_____

BYE, Circuit Judge.

The parties to this diversity action together pioneered the marketing of soybean seeds in the 1970s, jointly ventured into the seed-breeding business in the 1980s, and wound up in federal court when their industry entered the biotechnology age. The main issue on appeal is whether restrictions in the parties' 1986 joint-venture agreement (the Agreement) applied to the inheritable genetic makeup, or germplasm, of the seed at issue or applied only to the seed itself.

The district court[1] determined the Agreement protected the germplasm and granted summary judgment for appellee Midwest Oilseeds, Inc. (MO). On appeal, appellant Limagrain Genetics Corporation (CEI)[2] challenges this judgment and other rulings by the district court. We affirm.

At this point, we provide an overview of the complex procedural history of this case. While Section I provides a recitation of the essential facts, some details are reserved for the legal analysis in subsequent sections.

MO sued CEI in Iowa state court, and CEI removed the case to federal district court. MO alleged CEI had made unauthorized use of MO's restricted germplasm. Specifically, MO alleged CEI breached the Agreement by performing unauthorized breeding with MO seeds and their descendants and by licensing MO seeds and their descendants to third parties without use restrictions. MO sought liquidated damages of $10 for each bushel marketed in breach of the Agreement. CEI brought seven counterclaims, the first of which alleged MO itself breached the Agreement by failing to pay CEI royalties due under the Agreement.[3]

The district court granted summary judgment on MO's breach-of-contract claim and ruled the liquidated-damages clause in the agreement was enforceable. The court also granted MO's motion for summary judgment on all CEI counterclaims except the first. Hence, the measure of damages owed MO, as well as CEI's breach-of-contract counterclaim, proceeded to trial.

---

[1]The Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa.

[2]For the sake of clarity, we refer to appellant Limagrain Genetics by the initials of its predecessor in interest, Callahan Enterprises, Inc., the party to the Agreement.

[3]The Agreement calls these royalties "research fees."

On the eve of trial, MO brought a Motion for Judgment Based on Prior Rulings, arguing the court's construction of the Agreement applied retrospectively to restrict CEI's use of MO seed which CEI had received before the execution of the Agreement on March 14, 1986. The district court granted the motion but again concluded the measure of damages was a jury issue.

The jury found CEI and its licensees sold or transferred 3,449,445 bushels of seed in breach of the Agreement. Accordingly, the court entered a judgment of $34,494,450 ($10 x 3,449,445 bushels) in favor of MO. The jury also found CEI was entitled to $1,818,055 in damages for MO's failure to pay fees on 4,243,542 bushels of seed MO had licensed (i.e., $0.4266 per bushel).

Post trial, the court thrice entered judgment as a matter of law (JAML). First, the court determined eleven additional seed lines should have been included in the verdict and awarded MO an additional $4,339,010 in damages.[4] Accordingly, the court amended the verdict to $38,833,460. Second, the court ruled only seven of the thirty-one seed varieties at issue in CEI's counterclaim were subject to the Agreement's fee-sharing provision. Accordingly, the court reduced CEI's award to $180,725.80. As to the remaining seven varieties, the court granted MO's motion for a new trial, concluding the court had erroneously placed the burden of proof on MO instead of CEI, the party alleging the breach on the counterclaim. CEI then conceded it could not meet the burden, and so the court entered JAML in favor of MO on the entire counterclaim.

The court entered final judgment in favor of MO and against CEI in the amount of $40,892,353.67, consisting of damages, interest, costs, and fees. This timely appeal followed.

---

[4]CEI does not appeal this ruling per se. Rather, it challenges the district court's general interpretation of the contract that supports the damages award as a whole.

On appeal, CEI claims the district court erred when it (1) granted summary judgment for MO on its breach-of-contract claim, (2) ruled the liquidated-damages provision was enforceable, (3) concluded the Agreement's restrictions applied retrospectively to MO seed CEI received before the Agreement's effective date, (4) granted MO's motions for JAML and a new trial on CEI's first counterclaim, and (5) dismissed three of CEI's other counterclaims. We affirm in all respects.

I

A. Early Relationship Between the Parties

In 1975, Midwest Oilseeds, a corporation formed by Harry Stine in 1972 to breed soybean seed, and Callahan Enterprises, Inc. first collaborated to breed and market new variations of soybean seed. Under their initial agreement, renewed in 1981, MO developed seed and CEI served as MO's exclusive distributor.

In 1982, a year after CEI started its own breeding program, the two companies formed a joint venture. They shared seed varieties with each other, and each compensated the other with research fees, or royalties, for the sale or transfer of seeds developed in the venture.[5] Other than the duty to collect and pay these royalties, the agreement placed no restrictions upon the use of the other party's seed in the development of new seed varieties.

In 1983, however, MO started to restrict the use of the seeds it developed and sold to third parties. Typically, MO permitted its customers to use seeds only to grow

---

[5]Under the fee-sharing arrangement in Paragraph 7 of the Agreement, the parties evenly split (50% - 50%) fees collected on seed developed by one party and marketed by the other. On seed both developed and marketed by one party, that party received 2/3 share of the fees (66.6%) and the other party received the remaining 1/3 (33.4%).

grain for feed or processing. Breeding with the seeds was prohibited. In other words, with the dawn of bioengineering, MO started treating the genetic material in the seeds, the germplasm, as intellectual property.

## B.  The 1986 Negotiations and Agreement

In February 1986, MO gave formal notice to CEI that it was terminating the 1982 agreement, and the parties started negotiating a new contract. Mr. Stine himself handled negotiations for MO; counsel represented CEI. Mr. Stine amended the 1982 agreement by hand, adding Section 4,[6] a provision restricting CEI's use of MO seed. CEI then typed a version of the contract making the restrictions mutual. In response, MO asked CEI to share the liabilities and costs of enforcing the restrictions on third parties. Because CEI believed the restrictions would be unenforceable, it ultimately agreed to restrict its use of MO seeds unilaterally, and as a result, the final version of the Agreement incorporated the amendments Mr. Stine had first inserted in his own hand. As we discuss at length in Section II of this opinion, these amendments limited CEI's seed-breeding use of MO seeds to making first-generation A X B crosses.

## C.  Subsequent Dealings

In July 1987, MO wrote CEI a letter expressing concern about a possible breach of the Agreement. The letter asked CEI to advise all parties who had received "Midwest developed seed or seed derived by use of Midwest developed seed of the restrictions referred to in [Paragraph 4(b)]." Instead of disputing MO's assertion Paragraph 4(b) applied to seeds with a Midwest pedigree, CEI responded it was implementing the program.

---

[6]Section 4 consists of Paragraphs 4(a) and 4(b).

5

Next came three attempts by CEI to amend Paragraph 4(b).  In 1987, CEI proposed making the restrictions mutual and giving CEI a blanket exclusion from the restrictions in the development of new lines.  In 1988, CEI proposed an amendment allowing the party originating a line to decide whether the restrictions would apply.  In 1988, Rhone-Poulenc (Rhone), a French Company, acquired CEI for sixteen million dollars.  On June 12, Rhone's president wrote Mr. Stine, inviting him to discuss the possible acquisition of MO, or alternatively, an amendment to the Agreement.  A Rhone internal document dated weeks before the letter and entitled "Recommendations - M.O./C.E.I. Contracts" stated, "Germplasm Policy - delete CEI restrictions and have mutual usage policy . . . . CEI needs to establish CEI germplasm policy."

After MO thrice declined to amend the Agreement, CEI gave formal notice of termination on July 1, 1989, effective in two years.  CEI's president stated Rhone directed the termination because Rhone could not live with the contract as it stood.  Under the terms of the Agreement, either party could terminate the agreement with two-years notice, but the agreement provided research fees would continue after termination for seeds in elite trials which the parties had not deleted from the venture.

D.  Alleged Breach of the Agreement

In 1996, MO learned CEI had bred subsequent generations of MO offspring.  In a series of letters, the parties disputed whether CEI's conduct violated Section 4.  In internal documents, a Limagrain[7] official stated the question was unanswered, and an officer opined MO's restrictions were against United States law and recommended CEI wait silently for Mr. Stine to attack.  After conducting a legal review, CEI took

---

[7] Limagrain, another French company, had purchased CEI from Rhone in 1994.

the position it could breed freely with seeds having an MO pedigree and market the resulting offspring without paying MO royalties. At this point, MO did not sue.

In 1998, MO learned CEI had not only been engaged in its own breeding activities, but had also licensed to third-party competitors seeds owing their lineage to MO-developed seeds. Soon after, the parties entered into negotiations, which collapsed in August 2000. On November 29, 2000, MO filed the present lawsuit.

E. Other District Court Proceedings

In its complaint, MO properly pleaded three legal theories: Breach of contract, conversion, and misappropriation of trade secrets. The district court granted MO's summary judgment motion on the breach-of-contract claim. The court explained CEI had failed to raise the particulars of its affirmative defenses to liability in resisting the summary judgment motion and had thus failed to meet its burden of proof. Later in the proceedings, the district court granted MO's motion to sever the conversion and misappropriation claims, based on MO's stipulation it would dismiss these claims with prejudice if this court affirms summary judgment on the breach-of-contract claim. Because we do affirm, MO's other claims will be dismissed with prejudice.

II

We review motions for summary judgment de novo, applying the same summary judgment standard as the district court, Hall v. Lhaco, Inc., 140 F.3d 1190, 1193-94 (8th Cir. 1998), and considering whether the district court properly followed the substantive law. Carpenter v. Auto. Club Interinsurance Exch., 58 F.3d 1296, 1304 (8th Cir. 1995) (citing Salve Regina Coll. v. Russell, 499 U.S. 225, 239-40 (1991)). The parties to this diversity action agree Iowa substantive law applies. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Lambert v. City of Dumas, 187 F.3d 931, 934 (8th Cir. 1999); Fed. R. Civ. P. 56(c). We view the evidence, as well as the inferences that may be reasonably drawn from the evidence, in the light most favorable to the non-moving party. Enter. Bank v. Magna Bank of Missouri, 92 F.3d 743, 747 (8th Cir. 1996). However, summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules of Civil Procedure, which are designed to secure the just, speedy, and inexpensive determination of every action. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

A. The Plain Language of the Agreement

In interpreting a contract under Iowa law, we must first examine the plain language of the contract. See Walsh v. Nelson, 622 N.W.2d 499, 503 (Iowa 2001). If its terms are unambiguous, we may not substitute a different meaning for that which the parties clearly intended and embodied in unambiguous terms. Id. On the other hand, if the terms are ambiguous, we may consider extrinsic evidence to determine the intent of the parties in signing the contract. See id. at 504; Kroblin v. RDR Motels, Inc., 347 N.W.2d 430, 433 (Iowa 1984) (reasoning the trial court properly considered post-signing conduct as evidence of the parties' intent). Looking no further than contract terms, the district court concluded there was no issue of material fact CEI had breached the Agreement by (1) improperly licensing third-party breeding rights for seeds owing their lineage to restricted MO seed, and (2) performing unauthorized breeding beyond the first-generation A X B crosses permitted by Paragraph 4(b).

We agree the conclusion CEI breached the Agreement follows inevitably from a natural and sequential reading of the Agreement. Our starting point is Section 4, which consists of two critical paragraphs:

8

4. Private Label Soybean Licensing Agreement
>(a) CEI and MO shall sign Private Label Soybean Licensing Agreements as approved by MO and CEI with all participating seed companies and seedsmen. CEI and MO shall be responsible to each other for collection of fees on all seedstock sold of varieties owned by the other party.

>(b) The . . . Seed Purchase Agreement, a copy of which is attached, shall apply to all MO developed seeds and the principles of such shall be incorporated into the Licensing Agreement referred to in sub paragraph a above . . . .

Thus, the Licensing Agreements in Paragraph 4(a) required purchasers to pay royalties for the right to use the seeds produced in the joint venture, and each party to the contract agreed to collect fees for the venture when it sold the other party's seed to third parties. More importantly, Paragraph 4(b) incorporated the Seed Purchase Agreement (SPA) by reference and applied the SPA's requirements to all "MO developed seeds," including those sold to third parties under 4(a).

We next turn our attention to the SPA, which Paragraph 4(b) incorporated by reference. The SPA imposed three requirements on the purchaser of MO seeds. First, it limited use of the seeds to feed or processing:

>Purchaser hereby acknowledges and agrees that the production from the Midwest Oilseeds Soybean Seeds herein sold *will be used only for feed or processing and will not be used or sold for seed, breeding or any variety of improvement purposes*.

(Emphasis added.) Second, through the SPA, MO retained a proprietary interest in the seeds it sold and forbade using MO seed for breeding new seed varieties:

Purchaser acknowledges Supplier's proprietary interest in the use of subsequent production from the seeds herein sold, and agrees *it would be a violation of this agreement to allow the subsequent production of the seed herein sold to be used to create a seed variety or seed product from said production . . . .*

(Emphasis added.)  Third, as we will discuss below, the SPA contained a liquidated-damages provision, whereby purchasers agreed the unauthorized use of MO seeds would cause MO damages of $10 per bushel.  By incorporating the SPA, therefore, Paragraph 4(b) categorically forbade CEI and all third-parties from using MO seeds for breeding.

In the light of this general prohibition against breeding with MO-developed seeds, we now turn our attention to the pivotal provision in the Agreement, an exclusion in the second part of Paragraph 4(b):

CEI research shall be excluded from the restrictions of the Seed Purchaser Agreement for *purposes of making A X B[8] crosses* (not back crosses or biotechnical alterations) *if such resulting populations are available for use by MO and subsequent lines selected from the populations are marketed under the terms of this agreement.*

(Emphasis added.)  CEI argues this provision permitted it to use the offspring of the A X B crosses without any restrictions.  We disagree.

By its own terms, the limited exclusion imposed two conditions on CEI's use of MO-developed seed in breeding:  First, CEI had to make available to MO the offspring resulting from the A X B cross, and second, subsequent lines selected from such offspring had to be marketed according to the terms of the Agreement.  In other

---

[8]The parties agree A X B crosses refer to the first-generation offspring from parents A and B, where at least one of the parents is a MO-developed seed.

words, while the exclusion permitted CEI to make A X B crosses using MO seed, it did not grant CEI unconditional use of the resulting offspring. CEI first had to share the offspring with MO for the latter's own subsequent research and breeding. More importantly, CEI could not use marketable lines selected from the offspring without complying with the first part of Paragraph 4(b) and the SPA. Because the SPA, again, limited the use of MO-developed seeds to feed and processing, CEI's use, other than the narrow exclusion, was limited to marketing the seeds for feed or processing. Stated conversely, neither CEI nor third parties could use the resulting offspring for "breeding or any variety of improvement purposes."

CEI's argument flows as follows. By incorporating the SPA by reference, the first part of Paragraph 4(b) restricted the use of *MO developed* seeds for feed or processing. The second part of Paragraph 4(b) excluded CEI from this restriction insofar as it permitted CEI to make A X B crosses to produce a new seed variety, which we will call AB. Because AB was developed by CEI and not by MO, the variety is not an *MO-developed* seed and therefore is not subject to the restrictions in Paragraph 4(b) and the SPA.

CEI, of course, invites us to read Paragraph 4(b) in an unnatural and circular manner. As though viewing one of Escher's impossible structures, we are to read the second condition to the exclusion – that subsequent lines selected from AB populations be marketed under the terms of the Agreement – and circle back to the first part of Paragraph 4(b), only to realize then the AB populations are not subject to the prohibition against breeding after all.

Such a reading, of course, subverts critical language in the Agreement and renders the structure of Paragraph 4(b) surreal. For one, the scope of the exclusion – "for purposes of making A X B crosses" – is entirely drained of meaning, for CEI can now use MO seeds to breed any seed variety however removed from the MO ancestor. Similarly, the second condition is rendered superfluous, for it operates only

11

to direct the reader back to the top of the Paragraph, to learn the condition itself serves no substantive purpose. More importantly, CEI's reading renders the SPA's key provisions inapplicable to the A X B offspring and its progeny. If the meaning and intent of Paragraph 4(b) were to grant CEI limitless use of MO seed, then there would be no need to incorporate the SPA's restrictions in one sentence only to write them out in the next.

We conclude the Paragraph 4(b) exclusion granted CEI no more than a limited license to use MO seeds to create first-generation varieties to be marketed according to the terms of the Agreement. We therefore hold CEI breached the Agreement when it exceeded the scope of the limited exclusion by improperly licensing third-party breeding rights for seeds owing their lineage to restricted MO seed and by performing unauthorized breeding beyond the A X B crosses permitted by Paragraph 4(b).

B. Extrinsic Evidence

Even if we somehow deemed the contract ambiguous, we would reach the same conclusion after considering the extrinsic evidence. Under Iowa law, we read a contract in light of the surrounding circumstances, giving such practical construction as the parties themselves placed upon it. Kroblin, 347 N.W. 2d at 433 (holding the manner the parties performed during the first two years of the contract was relevant to the meaning of the contract terms). In this case, CEI's conduct reveals it understood the Agreement as placing restrictions on the use of MO germplasm.

In July 1987, for example, Mr. Stine wrote CEI a letter expressing concern about a possible breach of the Agreement by CEI licensees. He asked CEI to remind all parties of SPA's restrictions, which applied to "seed derived by use of Midwest developed seed." A week later, CEI responded that it was implementing the program. Clearly, CEI understood the SPA to protect the genetic makeup of the MO seed.

12

More critically, CEI's conduct reflects its understanding *it* too was required to observe the SPA's restrictions. CEI thrice proposed amending the Agreement. First, in 1987, CEI sent Mr. Stine an amendment to Paragraph 4(b) for him to "sign and return." The amendment would have made the SPA's restrictions mutual and given CEI the blanket exclusion it had failed to secure in the Agreement. As part of the amendment, CEI proposed each originator of a seed bear the costs and liabilities of enforcing the restrictions – essentially the same concept CEI had rejected in negotiations. Second, in 1988, CEI proposed an amendment to allow the party who originated a line to decide whether the restrictions applied. As with the previous proposal, this amendment would have been unnecessary if the Agreement already allowed CEI to breed with the A X B offspring without restrictions. Finally, in 1989, Rhone wrote Mr. Stine a letter inviting him to discuss Rhone's proposal to acquire MO or, alternatively, an amendment to the Agreement. A CEI internal document dated weeks before Rhone's letter and entitled "Recommendations - M.O./C.E.I. Contracts" states "Germplasm Policy - delete CEI restrictions and have mutual usage policy . . . . CEI needs to establish CEI germplasm policy."

Both the plain language of the Agreement and the extrinsic evidence establish CEI agreed to limit its use of MO seeds to A X B crosses. We highlight the fact CEI admits it bred subsequent generations from the AB offspring and licensed MO germplasm without MO's consent and without paying MO fees. Having concluded these actions constituted a breach of the Agreement, we affirm the district court's grant of summary judgment for MO on its breach-of-contract claim.[9]

---

[9]CEI also argues the district court erred in deciding the Agreement applied "retrospectively" to MO seeds CEI acquired between 1982 and 1986. CEI contends it received these seeds under the 1982 contract, without the SPA's restrictions. Because Paragraph 4(b) states the SPA's restrictions apply to "*all* MO developed seeds" (emphasis added), and Section 12 states the Agreement supersedes any previous agreement, seeds that MO provided to CEI under the 1982 contract are also covered by the Agreement and its restrictions. Further, because breeding a new line

13

C. CEI's Defenses to Liability for Breach of Contract

In its resistance to summary judgment, CEI asserted three equitable defenses to liability: laches, waiver, and mitigation of damages. Because CEI "barely mentioned these defenses" and failed to raise "the particulars of these defenses," the district court concluded they could not shield CEI from the consequences of its breach. On appeal, CEI explains it did not develop the defenses because the district court imposed a page limit on the resistance papers.

"In resisting a properly supported motion for summary judgment, the plaintiff has an affirmative burden to designate specific facts creating a triable controversy." Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004) (internal quotation and citation omitted); see Fed. R. Civ. P. 56(e). The specificity requirement of Rule 56 applies with equal force where the defendant resists summary judgment, especially where the defendant resists by asserting affirmative defenses which it has a burden to prove. As the party resisting summary judgment in this case, then, CEI had an affirmative burden to identify specific facts in the record showing its defenses raised a triable issue against its liability. This CEI did not do.

CEI admittedly failed to identify in its summary judgment response any such facts that might exist in the record. Only now, on appeal, does CEI assert facts purporting to create a triable material issue supporting its defenses. In effect, CEI asserts for the first time facts it believes should reverse the summary judgment. "Factual assertions that defeat a summary judgment," however, "cannot be presented

takes at least six years and CEI did not start its own breeding program until 1981, the district court correctly reasoned CEI had not yet developed any offspring from MO seeds as of 1986. Thus, when the Agreement protected MO's proprietary right in the offspring of MO seeds, the protection reached all the MO parents CEI had received between 1982 and 1986, even those with which CEI may have started to develop new lines.

14

for the first time to [an] appellate court, and only those matters properly before [the] district court for summary judgment consideration are subject to appellate review." Garcia v. Pub. Health Trust, 841 F.2d 1062, 1066 (11th Cir. 1988) (quotation and citation omitted). Cf. White v. McDonnell Douglas Corp., 904 F.2d 456, 458 (8th Cir. 1990) (stating a district court is not "obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim").

In any event, even if we reviewed the merits of CEI's defenses, we would still affirm. According to the record, MO did not confirm CEI was improperly licensing germplasm to third parties until 1998, at which time MO initiated negotiations with CEI. When the talks broke down in August 2000, MO immediately brought this lawsuit in November. On these facts, we doubt we would hold the district court abused its discretion in denying CEI equitable relief, where CEI failed to develop any argument in support of the equitable defenses. See Lincoln Benefit Life Co. v. Edwards, 243 F.3d 457, 461 (8th Cir. 2001) ("We review a district court's denial of equitable relief for abuse of discretion."); Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575, 1584 (Fed. Cir. 1995) (stating the determination of inequitable conduct is committed to the discretion of the trial court and reviewed for abuse of discretion).

In sum, the district court's judgment finding CEI liable for breach of contract is affirmed.

III

CEI challenges the district court's determination the liquidated-damages clause was enforceable as a matter of law. "Under Iowa law, the question whether a contract provision is a valid liquidated damages provision or an unenforceable penalty is a question of law for the court." MidAmerican Energy Co. v. Great Am. Ins. Co., 171

F. Supp. 2d 835, 848 (N.D. Iowa 2001) (quotation and citation omitted). Consequently, review is for correction of errors of law. Aurora v. Michael Albert, Inc., 548 N.W.2d 153, 155 (Iowa 1991).[10]

We begin the analysis by deciding whether CEI bears the burden of proving the provision is an unenforceable penalty or MO bears the burden of proving it is a valid liquidated-damages clause. As the Iowa Supreme Court has not directly answered the question, we must predict how that Court would decide this unresolved issue of state law, using decisions from other jurisdictions as aids. See Gravquick A/S v. Trimble Navigation Int'l. Ltd., 323 F.3d 1219, 1222 (9th Cir. 2003). In other jurisdictions, the "prevailing rule is that the party challenging the enforceability of a liquidated damages clause has the burden of proving that it is a penalty." Honey Dew Assocs., Inc. v. M & K Food Corp., 241 F.3d 23, 27 (1st Cir. 2001). Furthermore, the Iowa Supreme Court has recognized and endorsed the trend favoring liquidated damages. See Rohlin Constr. Co. v. City of Hinton, 476 N.W.2d 78, 79-80 (Iowa 1991). As a district court recently concluded, "the Iowa Supreme Court would assign the burden of proving the unenforceability of a liquidated damages clause to the party raising that defense." MidAmerican, 171 F. Supp. 2d at 849.

In Rohlin, the Iowa Supreme Court adopted the standard for liquidated damages in the Restatement (Second) of Contracts. 476 N.W.2d at 80. Whether liquidated damages are reasonable turns on the combination of two factors: (1) whether the fixed amount reasonably approximates the loss caused by the breach, and (2) the difficulty either in proving the loss has occurred or in establishing the amount of the loss with certainty. Id. If the difficulty of proof is great, considerably more latitude is allowed in the approximation of the actual harm. Id.

_____

[10]Because our jurisdiction is based on diversity, we look to state law for the proper standard of review. See Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938); see, e.g., Burke v. Deere & Co., 6 F.3d 497, 511 (8th Cir.1993) (applying state law standard of review in reviewing sufficiency of the evidence in a diversity case ).

16

In this case, the SPA contained the following liquidated-damages provision:

> Purchaser agrees and acknowledges that any use of Midwest Oilseeds Soybean Seeds in violation of this agreement, will cause a minimum damage to Midwest Oilseeds, Inc. of $10.00 per bushel for each bushel so used, and that if subsequent production of the seed herein sold is used to create a seed variety or seed product a minimum damage to Midwest Oilseeds, Inc. of $10.00 per bushel for all seed varieties or seed products thereby created will be caused.

MO argues the fixed amount of $10 per bushel certainly approximates, and perhaps even underestimates, MO's actual losses. MO presented the following evidence in support of its view:

# CEI secretly licensed the progeny of MO germplasm for compensation to MO's established competitors as well as start-up companies which can now use MO's intellectual property as a platform for future development. MO lost not only royalties but also a market advantage because it now has to compete against its own seeds.

# Blake Seiker, a consulting certified public accountant with over a decade of experience in the soybean business, testified that $10 per bushel was reasonable.

# In a recent transaction, a company's germplasm portfolio sold for over 28 times the amount of annual royalty revenue produced by that germplasm. From that transaction, we can extrapolate the $10 amount equals to 28 times a fee of $.36 per bushel ($10 \div 28 = .36$). Because $.36 is a reasonable fee,[11] the valuation of MO's

_____

[11]For example, the jury awarded CEI $.43 per bushel in fees on its counterclaim.

17

germplasm at 28 times the fee is consistent with the market price of germplasm as reflected in the recent transaction.

In response, CEI points out MO granted third parties several licenses charging less than a $1.00 per bushel and MO would pay CEI only $.43 per bushel on the counterclaim. From these numbers, CEI infers the amount of the liquidated damages grossly overstates MO's actual damages. CEI's argument, of course, is without merit. MO's third-party licenses granted only the right to plant the seeds, not to breed with them; thus it is understandable the licenses would reflect a price much lower than the value of the intellectual property. Similarly, because MO was free to use CEI's germplasm in breeding, the damages on the counterclaim reflect only the sales royalties owed to CEI.

CEI also argues MO charged Pioneer, another competitor, only $.25 to $.40 per bushel for first generation seeds and nothing for second generation seeds. In fact, Pioneer may have paid $1.80, but that is beside the point. Under the Pioneer contract, MO also received exclusive right to use Pioneer's germplasm. Rather than support CEI's position, the MO-Pioneer contract underscores the obvious – that germplasm has a value of its own, above and beyond sales royalties.

To summarize, while CEI fell far short of meeting its burden of proof, MO demonstrated a correlation between the market value of its actual losses and the value of the liquidated damages.

The second prong of the Restatement's test buttresses the district court's determination. Because the breach involves the release of MO's intellectual property to its competitors, damages are extremely difficult to determine in this case. As MO explained:

18

\# MO suffered not only the loss of royalties from sales of its seeds but also the competitive advantage of owning unique intellectual property. MO now has to compete against its own seeds.

\# The damage to MO goes far beyond the losses MO has suffered thus far. MO lost streams of revenue from future generations of seeds with MO ancestors.[12]

\# MO must subpoena soybean companies to obtain their breeding and sales records to determine their use of MO germplasm. In doing so, MO suffers a loss of goodwill in the industry.

\# These records, in any event, do not paint the full picture. Under at least one of CEI's licenses, the third-party licensee had no obligation to report or track the use of the restricted MO germplasm after the second generation.

\# Informal and oral agreements and other breeding relationships abound in the industry. These arrangements make it nearly impossible to find and trace the unauthorized use of MO germplasm.

On these facts, the true measure of the damages is indeed difficult to ascertain. CEI argues damages are precisely ascertainable by multiplying the royalties due times the number of offending bushels. Such computations, of course, only produce MO's revenue losses from bushels traced to an MO ancestor; they do not and cannot ascertain the extent of MO's unknown current and future revenue losses from untraceable bushels. In other words, CEI again fails to recognize the breach denied MO a proprietary interest and a market advantage.

---

[12] In its summary ruling, the district court refused to hold the judgment open to allow MO to prove additional liquidated damages against CEI in the future.

Where the difficulty of proof is great, Iowa allows greater latitude in the approximation of the actual harm, Rohlin, 476 N.W.2d at 80, and so MO should prevail even with a rough approximation of its actual losses. Therefore, where MO advanced uncontested facts showing the $10 amount was reasonable, the district court properly determined the liquidated-damages provision was enforceable. We affirm this determination.

IV

A. Contract Provisions Implicated in CEI's Counterclaim

CEI's first counterclaim alleged MO had marketed certain seed varieties (lines and sublines) without paying CEI research fees. The counterclaim implicates three contract provisions whose meaning is not in dispute. First, Paragraph 10 permitted each party unilaterally to "delete" its lines from the joint venture. In other words, either party was permitted to withhold for its own breeding and marketing any of its own lines, removing the lines from the purview of the Agreement, including the fee-sharing arrangement.

Second, Paragraph 7 required each party to share with the other research fees for all lines of seed "marketed under the Agreement." That is to say, as to lines that remained in the program because they were not deleted, the parties were obligated to share research fees.

Third, Paragraph 9 provided that fees attached to undeleted lines once they were commercialized or entered elite trials. Importantly, once fee-sharing attached, the parties were obligated to share fees for as long as they marketed the variety, even after the termination of the Agreement.

To summarize, the Agreement permitted the parties to delete their lines from the program. As to those lines the parties did not delete, the Agreement required the parties to share fees once the lines reached elite testing or were commercialized.

B. Procedural History of the Counterclaim

The jury awarded CEI $1,810,055 in damages corresponding to MO's sale of thirty-one seed varieties. After trial, MO entered a renewed motion for JAML and, alternatively, a motion for a new trial. The district court concluded twenty-four of the thirty-one varieties at issue had neither entered elite trials nor been commercialized on the date the contract expired, July 1, 1991. These twenty-four varieties were therefore exempted by Paragraph 9 and no fees were due on them as a matter of law. As a result, the court set aside $1,629,329.20 of the $1,818,055 verdict, leaving CEI $180,725.80.

In support of its new-trial motion, MO argued (1) the award was excessive for the reasons the court granted the motion for JAML; (2) the court's jury instructions erroneously placed the burden of proof on MO instead of CEI, the party alleging the breach; and (3) CEI's counsel engaged in prejudicial misconduct. Without reaching the third argument, the district court agreed it would grant the motion.

Pursuant to Federal Rule of Civil Procedure 59, the court decided it would grant the new-trial motion unless CEI agreed to remit the $1,629,329.20, retain the $180,725.80, and waive its right to appeal the amount of the retained verdict. In response, CEI not only turned down the remittitur but also declined the new trial, conceding it would not be able to carry the burden of proving MO had breached the Agreement as to the seven varieties surviving JAML. CEI agreed MO was entitled to JAML on the entire counterclaim. On appeal, CEI argues the court erred in granting the motions for JAML and the motion for a new trial.

21

C.  Review of the Post-Trial Motions

We review de novo a district court's decision to grant a motion for JAML after a jury verdict.  Hathaway v. Runyon, 132 F.3d 1214, 1220-21 (8th Cir. 1997).  We must construe the facts in the light most favorable to the verdict, see Ollie v. Titan Tire Corp., 336 F.3d 680, 685 (8th Cir. 2003), and we will affirm the judgment only if the evidence is legally insufficient to support the verdict.  See Fed. R. Civ. P. 50(a); Belk v. City of Eldon, 228 F.3d 872, 878 (8th Cir. 2000).

CEI's appeal turns on the meaning of the word "subline."  MO argues sublines are varieties of seed distinct from the parent line from which they were identified and segregated.  CEI counters the distinction between line and subline is artificial and purposefully misleading.  Because, as we have seen, fees attached to varieties once they entered elite trials, the semantics are important because they will determine when the varieties entered elite trials, whether on their own when segregated as sublines or together with their parent line when it reached elite status.

At trial, MO presented evidence supporting its definition.  Mr. Stine testified sublines have a genetic code distinct from their parent line and it would be illegal to market a subline as the same variety as its parent.  MO's chief breeder, William Eby, and a Dr. Garland who testified for CEI agreed sublines undergo their own elite trials.  Mr. Eby added sublines are indeed identified and segregated and then developed and marketed as varieties distinct from their parents.  Such evidence clearly supported MO's definition of sublines as distinct varieties which are at some point segregated from their parents and developed into their own lines.

On appeal, CEI argues the practice of segregation is a fiction MO created to avoid paying fees on varieties by giving them a different suffix on their tracking number. For purposes of determining liability as a matter of law, of course, such bare allegations will not do.  CEI does not point to any evidence refuting Mr. Eby's

22

testimony sublines are indeed segregated, developed, and marketed separately. Nor does CEI challenge with any evidence in the record Dr. Garland's assertion sublines undergo their own elite testing. Finally, CEI fails to refute Mr. Stine's testimony sublines have a different genetic code and legally cannot be marketed as one variety with the parent. More to the point, CEI does not refute the fact the disputed sublines *have in fact been* identified, segregated, tested, and marketed for sound scientific and economic reasons. We conclude the sublines at issue in the counterclaim were indeed varieties distinct from the parent lines.

Critically, MO also presented evidence the sublines at issue had not been segregated from their parents before the Agreement expired on July 1, 1991.[13] The timing of the segregation matters because it determines whether the disputed varieties came under the purview of the Agreement. Under the terms of the Agreement, MO owed fees only on the disputed sublines segregated from elite parents before the Agreement expired. If a subline was segregated from the parent *after* the Agreement expired, then MO owed no fees on the subline because it did not exist as such at the time the Agreement was in effect.

Ironically, CEI concedes the varieties in issue were undifferentiated from the parents during elite trials in 1991. Because CEI believes sublines and parent lines are

---

[13]Mr. Eby gave unrefuted testimony sublines are identified and segregated one year before they enter elite trials. In other words, by looking at the date a subline entered elite trials, one could work backwards and figure out the earliest possible date when the subline must have been segregated from its parent. Based on this reasoning, the district court concluded sublines which were segregated before the contract terminated in July 1991 must have necessarily entered elite trials no later than 1992. According to plaintiff's exhibit 346, the court noted, only one subline at issue entered elite trials before 1993. Thus, with the one exception, all of the sublines were per force segregated after 1991 and were hence not subject to the fee provision. After subtracting these sublines from the jury's award, the district court concluded only seven varieties should have been tried before the jury.

identical and segregation is a fiction, CEI actually underscores the fact the varieties were not segregated before the Agreement expired. On this premise, CEI then argues MO owed fees on the entire parent line, including the varieties which MO later artificially differentiated as sublines. As we have already determined, however, CEI's premise is without support in the record. To reiterate, the sublines were indeed distinct varieties, and as CEI concedes, they were not segregated from their parent lines in 1991. Thus, the sublines necessarily entered elite testing after the Agreement ended, and they consequently never came under the fee-sharing provision.

Ultimately, CEI's position amounts to a claim over MO germplasm. Because CEI believes it is entitled to fees for sublines derived from the parent, CEI essentially makes a claim for the germplasm passed down to sublines ad infinitum. Taken to its logical conclusion, this argument would entitle CEI to receive fees in perpetuity for the entire progeny of a parent line which happens to have reached elite status during the life of the contract. Such a reading of the contract would vitiate Section 4 and the SPA – the contractual provisions we have already determined bestowed absolute protection upon the value of MO's intellectual property.

We conclude the uncontroverted evidence at trial showed the twenty-four sublines for which CEI received damages did not exist as such when the contract expired. Thus, these varieties were exempted by Paragraph 9, and CEI was not harmed when MO later identified, segregated, and marketed them. The district court, therefore, correctly granted the first motion for JAML.

We now turn to the district court's decision to grant the motion for a new trial. We review such a decision for abuse of discretion. United States v. Lee, 274 F.3d 485, 493 (8th Cir. 2001); Fed. R. Civ. P. 59(a).

CEI argues the court correctly assigned the burden of proof to MO at trial, because the deletion of the lines "is a condition subsequent excluding something that

would have otherwise been within the scope of the contract." Appellant's Brief at 80. We disagree. A condition subsequent discharges a duty that has already arisen under the contract. John D. Calamari & Joseph M. Perillo, Contracts § 11-7, at 442 (3rd ed. 1987). Here, the duty to pay fees did not arise until *after* MO decided not to delete lines. Thus, the non-deletion was a condition precedent to the duty to pay fees. See id. at 442-43.

Under traditional contract principles and Iowa law, the party asserting the breach has the burden of proving the breach, see Iowa-Illinois Gas & Elec. Co. v. Black & Veatch, 497 N.W.2d 821, 825 (Iowa 1993), and the same party has the burden of proving the condition precedent to liability was satisfied. Henschel v. Hawkeye-Security Ins. Co., 178 N.W.2d 409, 419 (Iowa 1970) ("[W]here the contract contains a condition precedent, the plaintiff must assume the burden of proof as to the happening of the condition upon which liability of the other party to the contract depends.").

We conclude the district court did not abuse its discretion when it granted a new trial on that part of CEI's counterclaim corresponding to the seven remaining varieties. In turn, after CEI conceded it could not meet the burden of proving MO had breached the Agreement, the court properly entered JAML for MO on these seven varieties. We therefore affirm the district court's grant of the motion for JAML on the entire breach-of-contract counterclaim.

D. CEI's Other Counterclaims

CEI appeals the district court's summary dismissal of three of its other counterclaims. We agree with the district court these claims were entirely without merit and deserved the summary disposition they received. They are all based on the premise the protections of Paragraph 4(b) and the SPA were bilateral so that the Agreement restricted MO from breeding with CEI germplasm. Because such a

25

reading of the contract is absolutely without foundation in fact or law, we summarily affirm the district court's judgment as to these claims.  <u>See</u> 8th Cir. R. 47B.

V

For the foregoing reasons, we affirm the judgment of the district court.

_____