In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1631

S&O LIQUIDATING PARTNERSHIP, et al.,

Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

Appeals of:  David Beach, Robert M. Berliner,
Jay I. Borow, et al.

Appeal from the United States Tax Court
No. 7131-98--John O. Colvin, Judge.

Argued November 5, 2001--Decided May 23, 2002


   Before COFFEY, ROVNER and EVANS, Circuit
Judges.

   COFFEY, Circuit Judge.  The Tax Court
permitted several former partners of the
now-defunct accounting firm of Spicer &
Oppenheim ("Spicer") to intervene and
participate in a global settlement
regarding the partnership's tax returns.
The appellants, who are the original
partners and signatories to the
agreement, objected to the intervention
but nonetheless signed closing agreements
that resolved their disputes with the
Commissioner prior to filing this appeal
of the Tax Court's decision. Because the
closing agreements render this appeal
moot, we dismiss for lack of subject
matter jurisdiction.

I.   FACTUAL BACKGROUND

   Spicer was a general partnership that
performed certified public accounting
services and was headquartered in New
York City. The firm suffered substantial
financial difficulties caused by the
stock market crash of 1987 and the loss
of a number of clients. In an effort to
retain its partners, Spicer borrowed
money against its accounts receivable,
i.e., its anticipated future income, and
used this money to make cash payments to
the partners. Spicer recorded these

payments as debts owed to the partnership, and these debts exceeded the combined value of the partnership's income and the partners' capital accounts. That is to say, the business ran a deficit, as reflected by the amount invested by each partner in the partnership, throughout much of the late 1980s.

During the firm's taxable year ending September 30, 1990, a total of twenty-nine partners--including the appellants--withdrew from the partnership. The amount that the withdrawing partners were obligated to reimburse Spicer totaled approximately $6.25 million. Unfortunately, none of these partners attempted to repay his or her debts at the time of withdrawal, and a dispute arose over the proper treatment of this $6.25 million for purposes of paying taxes. The departing partners characterized their distributions as "loans" rather than taxable "gross income." The remaining partners, on the other hand, insisted that the distributions should be reported as "deemed distributions" or "guaranteed payments" that were deductible on the Spicer's tax returns and chargeable as gross income to the departing partners. I.R.C. sec. 707(c). In the end, Spicer's executives claimed the entire amount as a deductible guaranteed payment and advised the withdrawing partners that they should report their receipt of money as "gross income" for purposes of personal tax liability during the 1990 tax year.

Spicer ceased doing business in November 1990 and changed its name to the S&O Liquidating Partnership ("S&O"). The Internal Revenue Service ("IRS") then conducted a partnership-level audit of S&O's records and ultimately disallowed the partnership's deductions for the payments it made to the withdrawing partners. S&O protested this ruling and filed a formal challenge in the Tax Court. Eleven of the twenty-nine partners who had withdrawn money from the firm elected to participate in this proceeding. (This group of partners was led by Appellant David T. Beach and became known as "the Beach group"). In December 1999, after nine years of litigation, a "Stipulation of Settlement" or "Settlement Agreement" was reached among the Beach group, the Commissioner,

and S&O. The agreement contained numerous provisions, including an explicit statement that the settlement was intended to "resolve all of the issues in this case."

Participants in the settlement were required to: (1) file amended individual tax returns for 1997; and (2) execute written "closing agreements" that definitively and conclusively itemized the amount of their tax liability and listed their outstanding obligations to the United States. The participants also agreed to withdraw their claim stating that the guaranteed payments were loans rather than income and, thus, agreed to pay income tax on the disbursements. However, the participating partners also were granted two significant tax breaks. First, the IRS allowed them to avoid seven years of interest and penalties by treating the payment as due in 1997 rather than 1990. Second, in what the parties refer to as "the concession," S&O agreed to refrain from claiming a $467,000 tax deduction on behalf of the partnership. The settlement provided that the $467,000 would be allocated equally among every partner who joined in the settlement, resulting in each participant being excused from reporting his share of that concession as income.

The most controversial aspect of the Settlement Agreement--which caused this appeal--was a provision that granted ten additional Spicer partners, who neither prosecuted nor supported the litigation, an option to intervene in the settlement at this late date and receive a portion of the $467,000 concession. Specifically, the agreement provided that each partner who joined in the settlement would receive a proportional share of the concession if he or she: (1) executed closing agreements and filed amended individual tax returns for 1997; and (2) filed these documents within two weeks from the date that the Tax Court approved the Settlement Agreement itself. Tax Ct. R. 248(b). The IRS insisted on this clause because it wished to reach a global settlement involving as many of the former Spicer partners as possible. On the other hand, the Beach group members agreed to this provision only reluctantly, for they realized that since the concession was equally divisible among each participant, every individual

partner would receive a smaller share of the concession as a result of the total number of parties being increased.

   Ultimately, seven additional Spicer partners elected to join in the settlement, and the court thereafter issued an order on March 15, 2000 permitting their intervention upon the submission of closing agreements and amended tax returns within two weeks. While these "new" partners submitted their returns on March 30, 2000--one day after the deadline mandated by the Settlement Agreement--Judge Colvin overruled the Beach group's objection that the submissions were untimely, stating as follows:

While the Court filed the notices of election to participate on March 15, 2000, the first possible date for participation by the new participating partners would be March 16, 2000. Thus, it was reasonable to interpret from the deadline by counting two weeks from March 16, 2000, with March 17, 2000 counted as Day One. Thus . . . we find that the new participating partners and respondent correctly calculated March 30, 2000 as the deadline.

The court further noted that the Settlement Agreement did not contain any "time-essence" provision and also found that, even assuming that the Spicer partners' documents were filed one day late, the partners had committed only an immaterial breach of the agreement that failed to warrant denying them a place at the table.

   After the Commissioner moved to enforce the Settlement Agreement, the Beach group filed a brief in opposition to the motion. The group members stated that they were responding "for the limited purpose of preserving appellate rights" and again argued that the Tax Court erred by accepting the submissions of the newly participating partners. Without addressing this argument, the Tax Court issued an order enforcing the settlement on behalf of the Commissioner, S&O, and all eighteen partners--including the seven intervening Spicer partners.

   Now it must be recalled that, despite the court's enforcement of the Settlement Agreement, each partner who wished to

take advantage of the concession remained obligated to file a closing document with the IRS delineating the precise amount of his or her tax liability for 1997. Several days after the Tax Court's decision was entered, each member of the Beach group executed a revised closing document recalculating his or her liability. The revisions were necessary because the Beach group's original closing documents and tax computations had been calculated and filed under the assumption that its share of the concession would be reduced by the amount necessary to accommodate the participation of all ten of the "new" partners. Thus, since only seven "new" partners joined in the settlement, each Beach group member's revised closing documents were adjusted to reflect a greater share of the concession than the amount set forth in his or her original documents.

The revised closing documents all state that they are intended to "globally resolve the dispute" and that the settlement was executed because "the parties to this agreement wish to determine with finality the amounts . . . to be reported under the global settlement." (Emphasis supplied). The documents further state that "[t]his agreement is final and conclusive." The documents neither mention any right of appeal nor contain any language indicating a reservation of appellate rights. However, in a cover letter forwarding the revised closing agreements to the Commissioner, counsel for the Beach group stated: "The submission of these documents should not be construed as a waiver of any appellate rights of my clients." Shortly after submitting the revised closing statements to the Commissioner and the Tax Court, the Beach group filed a Notice of Appeal challenging the court's decision that the seven Spicer partners' submissions were timely filed in accordance with the terms of the Settlement Agreement.

## II.  DISCUSSION

The Commissioner contends that we may not consider the merits of this appeal because the appellants' voluntary and final settlement of all issues before the Tax Court has rendered this action moot. We agree with the Commissioner, for we

are convinced that the Settlement Agreement disposed of the underlying controversy between the parties and deprived us of jurisdiction over this appeal. U.S. Const. art. III sec. 2; United States Bancorp Mortg. Co. v. Bonner Mall P'ship, 513 U.S. 18 (1994).

A closing agreement is a written agreement between an individual and the Commissioner that settles or "closes" an individual's liability for taxes during the period governed by the agreement. Matter of Avildsen Tools & Mach. Inc., 794 F.2d 1248, 1253 (7th Cir. 1986). If the document is signed by an individual and accepted by the Commissioner, then it is final, conclusive, and binding upon both the taxpayer and the IRS, for the purpose of the agreement is to terminate and dispose of tax controversies once and for all. United States v. National Steel Corp., 75 F.3d 1146, 1150 (7th Cir. 1996). Our colleagues on the Ninth Circuit recently dismissed a post-closure appeal and emphasized the finality to be accorded to a closing agreement by stating as follows:

In signing the closing agreement, Ms. Hopkins explicitly agreed to have her tax liability determined by the closing agreement. If Ms. Hopkins wished to try later to avoid the tax consequences flowing from that agreement, she had a duty to preserve any possible defenses to personal liability in that agreement. Having failed to do so, Ms. Hopkins should not now be permitted to reopen the question of her liability. . . . Permitting her to do so would undermine the very purpose of entering into a closing agreement in the first place.

In re Hopkins, 146 F.3d 729, 733 (9th Cir. 1998). In other words, the execution of a closing agreement resolves the underlying controversy and moots the case absent a showing of "fraud, malfeasance, or misrepresentation of a material fact." 26 U.S.C. sec. 7121(b).

In this case, although the Beach group opposed the entry of a final order allowing the Spicer partners to participate in the settlement, the group proceeded to file amended tax returns along with "final and conclusive" closing agreements shortly after the Tax Court entered its decision. Thus, by its own

actions, the group manifested an intent to proceed with the settlement and adhere to its requirements. The group waived any objections to the Tax Court's ruling on the inclusion of the Spicer partners and, therefore, mooted the underlying controversy.

Members of the Beach group argue that they had no meaningful choice but to sign the revised closing agreements, for the terms of the Settlement Agreement required the filing of such materials within a reasonable time after the court ordered its enforcement. (Reply at 5.) We reject this argument, for it contradicts the very language of the Settlement Agreement, which explicitly provides that any partner could refuse to sign the documents. According to the agreement, if any partner chose to reject the revised terms of settlement, then the Government was "entitled to release such party's closing agreement and any amended return to [the IRS] for processing." In other words, if a partner refused to submit a revised statement, then his or her original statement would become the final one. Although Beach group partners who filed the original statement would receive smaller shares of the $467,000 concession as a result of the judge's decision to allow the last-minute intervention of the Spicer partners, this does not imply that any Beach partner was under some type of compulsion to file the revisions. An individual is not deprived of her freedom of choice simply because neither option offers the precise package she wants. See Hitke v. Commissioner, 296 F.3d 639 (7th Cir. 1961).

By executing the revised closing agreements, the Beach group took affirmative steps to obtain better settlement terms than it would have received if it had adhered to the terms of the original agreements. A party who has accepted the benefits of a contract cannot "have it both ways" by subsequently attempting to avoid its burdens. Skelton v. GM Corp., 860 F.2d 250, 260 (7th Cir. 1988). By acting to obtain more favorable settlement terms, the Beach group must also bear any burdens that have accrued as a result of the settlement, such as waiving the right to appeal any rulings of the Tax Court in the underlying litigation. See id.

We also reject the appellants' argument that we should give effect to the letter that their attorney mailed to the IRS, which stated his view that the revised closing agreements must "not be construed as a waiver of any appellate rights." (Br. at 18-19.) A duly approved closing agreement, signed by the participating individuals, is a contract that is governed by federal common law and is interpreted under "standard principles of contract law--more precisely, the core principles of the common law of contract that are in force in most states." National Steel, 75 F.3d at 1150. Thus, if a closing agreement's terms are clear and unambiguous, we are obligated to enforce the language as it is written, without resort to extrinsic evidence or interpretive devices, such as a letter from a party's attorney purporting to attach a hidden meaning to anything therein. See id.; Rink v. Commissioner, 47 F.3d 168, 171 n.3 (6th Cir. 1995).

The closing agreements clearly, unequivocally, and unambiguously state that they are "final and conclusive" documents that "globally resolve[d]" this tax dispute. Neither the closing agreement nor the Settlement Agreement contains any provision that modifies this language and preserves the appellate rights of the Beach group members. Thus, we are convinced that the closing agreements have mooted any present challenge to the Tax Court's prior inter pretation of the Settlement Agreement, meaning that we lack jurisdiction over this appeal. See Anheuser-Busch Inc. v. Local #744, 280 F.3d 1133, 1141 (7th Cir. 2002); Funeral Fin. Sys. v. United States, 234 F.3d 1015, 1018 (7th Cir. 2000); Caisse Nationale de Credit Agricole v. CBI Indus. Inc., 90 F.3d 1264, 1272 (7th Cir. 1996).

In so holding, we note that we are unpersuaded by the argument that dismissal would punish the group members for choosing not to "breach the Settlement by refusing to execute the documents required" by the agreement. (Br. at 18.) A party cannot vitiate a closing agreement by attacking the provisions of the agreement that were negotiated, drafted, approved and signed by the party. The Beach group appellants were represented by learned and experienced counsel during the entire

nine years that this case was pending. It was foreseeable that the Tax Court would interpret the Settlement Agreement in a manner that would permit the intervention of the seven Spicer partners, yet the appellants thereafter signed a "final and conclusive" closing agreement that failed to preserve their right to dispute this ruling. "Men must turn square corners when they deal with the Government." FCIC v. Merrill, 332 U.S. 380, 385 (1947). Thus, this appeal must be dismissed. In re Miller, 174 B.R. 791, 797 (BAP 1994), aff'd, 81 F.3d 169 (9th Cir. 1996) (table).

III.  CONCLUSION

  We hold that this case was settled when the appellants voluntarily chose, after the Tax Court entered its decision, to execute contracts that were "final and conclusive" resolutions of their disputed tax liability. The absence of a live case or controversy between the parties deprives us of jurisdiction to entertain the merits of the appeal, and this case is therefore DISMISSED.

  It is so ordered.