Affirmed by unpublished opinion. Judge WYNN wrote the majority opinion, in which Judge DUNCAN concurred. Judge DAVIS wrote a dissenting opinion.
Unpublished opinions are not binding precedent in this circuit.
WYNN, Circuit Judge:
Under an Interim Servicing Agreement (“ISA”) Doral Bank PR (“Doral”) agreed to take over the servicing of a portfolio of mortgages (“portfolio”) owned by the Federal Home Loan Mortgage Corporation (“Freddie Mac”). However, because the existing servicer of the portfolio brought court actions that restrained Freddie Mac from transferring the portfolio to Doral, Freddie Mac terminated the ISA. Thereafter, Doral brought this action alleging that Freddie Mac breached the ISA by, among other things, failing to pay to Doral, pursuant to a provision in the ISA, an amount equivalent to twenty-four months of Doral’s anticipated service compensation fees under the ISA.
Upon consideration of cross-motions for summary judgment, the district court agreed with Freddie Mac that Doral’s damages were limited to its actual damages in the amount of $124,588. The district court therefore denied Doral’s claim for twenty-four months of service compensation fees reasoning that, in light of Doral’s forecast of evidence on damages, the ISA’s provision for liquidated damages amounted to an unenforceable penalty. For the reasons below, we affirm.
I.
Freddie Mac engages pre-approved lenders (“servicers”) to service its portfolio of mortgages.[1] The servicer performs day-to-day activities such as collecting payments from borrowers, accounting for and remitting borrowers’ principal and interest payments to Freddie Mac, and maintaining tax and insurance escrows to pay borrowers’ taxes and insurance. Since 1986, Doral, a commercial bank organized and operating under the laws of the Commonwealth of Puerto Rico, has been a qualified servi-cer of Freddie Mac’s mortgages.
This matter arose in 2008, when Freddie Mac began implementing its plans to ter- *33 mínate its servicing relationship with R & G Mortgage Corporation and R-G Premier Bank of Puerto Rico (collectively, “R & G”). On July 9, 2008, Freddie Mae and Doral initiated negotiations for Doral to step in for R & G and serve as Freddie Mac’s “interim servicer” on a portfolio comprising approximately 46,000 Freddie Mac loans with a total value of over $8.8 billion, which, up to that point in time, had been serviced by R & G. Accordingly, on July 11, 2008, Freddie Mac officially informed R & G that it was being terminated as its servicer of this portfolio. On that same date, Freddie Mac and Doral entered into the ISA under the terms of which Doral agreed to be its interim servicer of the same portfolio.
The terms of the ISA indicate two dates relevant to this appeal. First, in the opening paragraph of the ISA, the terms indicate that the ISA was “effective” July 11, 2008. J.A. 30. Second, in Section 2.6 of the ISA, “Effective Date” is defined as:
The effective date for commencement of the servicing of the Mortgages (“Effective Date”) by the Interim Servicer [Doral] shall be a date that Freddie Mae determines and communicates to the Interim Servicer that Interim Servicer will be servicing the Interim Portfolio. The Effective Date, when possible, will correspond to a date when Interim Servicer obtains the files for the Mortgages.
Id. at 88. Additionally, the ISA defined the “Interim Portfolio” as “[t]he portfolio of Freddie Mac loans that were once serviced by a terminated servicer.” Id. at 30.
On July 11 and 12, 2008, a Freddie Mac team met with Doral representatives. The Freddie Mac team advised Doral to have personnel ready on Monday, July 14, 2008 to go with Freddie Mac personnel to R & G’s offices to discuss a plan to initiate a transfer to Doral of the loans R & G was servicing for Freddie Mac. On July 14, 2008, Freddie Mac representatives, led by Russell McKoy, Freddie Mac’s file recovery team leader, went to R & G’s main offices to meet with R & G management. Although a Doral representative accompanied Freddie Mac employees, he was told by a Freddie Mac representative to wait outside, while Freddie Mac spoke with R & G. Consequently, Doral did not join Freddie Mac and R & G for these discussions.
On July 15, 2008, Freddie Mac returned to R & G’s offices, and during the course of the meeting, Doral representatives were invited to join. At this meeting, R & G’s representatives indicated they would not be able to provide data on the R & G loans that day and requested that Freddie Mac give R & G an additional day to compile the servicing files and the mortgage notes to give to Doral.
Later that day, Freddie Mac was served an ex parte temporary restraining order (“TRO”) issued by the U.S. District Court for the District of Puerto Rico, prohibiting Freddie Mac from terminating its servicing agreement with R & G and from transferring the portfolio.[2] That same day, Freddie Mac’s associate general, counsel spoke by telephone with a Doral attorney and a senior Doral executive, advising that all efforts to transfer servicing were on hold because a TRO had been issued against Freddie Mac. On July 17, 2008, Freddie Mac sent formal notification, which confirmed that, because of the TRO, the transferring of the Interim Portfolio from R & G to Doral was on hold. Notably, at no time were any R & G loan files, *34 documents, or electronic data transferred from R & G to Doral during the five-day period spanning from July 11 through July 15, 2008.
On July 22, 2008, the district court converted the scheduled July 28 preliminary injunction hearing into a settlement conference. Ultimately, Freddie Mac and R & G entered into a settlement agreement, signed by the district court, allowing R & G to continue to service Freddie Mac mortgages until R & G could sell its servicing rights to a qualified third-party buyer. See R & G Mortg. Corp. v. Fed. Home Loan Mortg. Corp., 584 F.3d 1, 6 (1st Cir.2009). Because of these events, Freddie Mac never transferred the R & G portfolio to Doral.
On August 14, 2008, Doral wrote to R & G, informing R & G that it would move to intervene in R & G’s pending action against Freddie Mac unless it was given a copy of the TRO. R & G refused this request via e-mail, explaining that paperwork in the case was under seal. “The email advised that Doral’s [ISA] was not directly at issue in the litigation but that, insofar as that agreement pertained to R & G’s portfolio of Freddie Mac mortgages, the TRO rendered Doral ‘unable to perform.’ ” Id. Thereafter, Doral attempted to intervene in the R & G action. Doral based its attempted intervention on its alleged contractual rights under the ISA. Doral’s intervention motion was denied, and the denial was affirmed on appeal. Id. at 12-13.
In early August 2008, Freddie Mac asked Doral to provide it with the costs incurred by Doral under the ISA; and on August 5, 2008, Doral transmitted to Freddie Mac its costs incurred figures, which totaled $124,588. On or about August 13, 2008, Freddie Mac formally informed Doral that the R & G loans would not be transferred to Doral for interim servicing under the ISA. Thereafter, Freddie Mac offered to reimburse Doral for its costs under the ISA in the amount of $124,588, as well as an additional sum equivalent to forty percent of Doral’s costs.
Doral, in turn, claimed that it was entitled to twenty-four months of service compensation fees under the ISA, which provided at Section 1.1 that:
Interim Servicer [Doral] agrees to provide servicing for such Interim Portfolio until such time as Freddie Mac determines to transfer servicing of such Im terim Portfolio. Unless the Interim Portfolio is transferred pursuant to court order or the Interim Servicers eleibility [sic] to sell mortgages to or service mortgages for Freddie Mac is suspended or terminated pursuant to section 1.3 [of the ISA], the length of interim servicing will not be less than 24 months. If the length of interim servicing is less than 24 months, then Freddie Mac will pay to Interim Servicer the total of 24 months of servicing compensation fee minus the number of months already billed by Interim Servicer. Freddie Mac shall not be responsible for this fee if it is ordered by court to transfer the Interim Portfolio from the Interim Servicer before the expiration of 24 months or if Freddie Mac terminates or suspends the eligibility of the Interim Servicer to sell mortgages to or service mortgages for Freddie Mac pursuant to section 1.3.
J.A. 30. In response, Freddie Mac rejected Doral’s claim for damages under Section 1.1, arguing that the “Effective Date” provision under Section 2.6 — i.e., the “effective date for commencement of the servicing of the Mortgages” — had not occurred. Specifically, Freddie Mac maintained that the obligations and liabilities in Section 1.1 were not triggered because Freddie Mac never “determine[d] *35 and communicate[d] to [Doral] that [Doral] w[ould] be servicing the Interim Portfolio,” as required by Section 2.6. J.A. 33.
On December 29, 2009, Doral brought an action in the Eastern District of Virginia alleging that Freddie Mac either partially or totally breached the ISA “by failing to pay Doral the servicing compensation fees due to Doral” for twenty-four months. Doral also asked for a declaration of the respective rights of Doral and Freddie Mac. J.A. 27. Freddie Mac responded by moving to dismiss Doral’s complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief could be granted. The district court denied Freddie Mac’s motion, concluding that it was unable to determine the parties’ contractual intent from the face of the ISA, that discovery regarding the circumstances of the transaction was appropriate, and that custom and practice evidence might be relevant to understanding the parties’ obligations under the ISA.
Following discovery, Doral filed an amended complaint, which left unchanged its contractual claims but amended certain factual allegations. After Freddie Mac answered the amended complaint, the parties filed cross-motions for summary judgment on both liability and damages. The district court granted summary judgment in favor of Doral as to its liability claims for breach of contract and as to its damage claims to the extent of $124,588, but denied claims as to all other damages (including, specifically, servicing fees, ancillary fees, and “on hold” costs). Freddie Mac’s motion for summary judgment was denied as to liability but granted as to all damages other than the amount of $124,588. Doral’s claim for declaratory relief was dismissed. Doral appealed.
II.
This Court reviews the district court’s decision granting summary judgment de novo. See Cont’l Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 508 (4th Cir.2002). Summary judgment is appropriate if “the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. Rule 56(c). Summary judgment is appropriate only if there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 56(c)).
Doral argues on appeal that the district court erred by misreading ISA Section 2.6 to require a separate communication of an “Effective Date” and by failing to find — if such a separate communication was required — that such communication was given. We disagree. As further explained below, we conclude that: (1) the ISA unambiguously creates — as the district court found — an “Effective Date” under Section 2.6 for the purposes of commencement of the interim servicing rights and obligations of Doral and Freddie Mac, which is separate and distinct from the ISA’s “effective date” for other contractual obligations, including, for example, rights and obligations during the pre-servicing period (e.g., Freddie Mac’s obligations to reimburse Doral for actual expenses incurred during this pre-servicing period under Section 2.5(c) of the ISA); and (2) irrespective of whether Freddie Mac “determined and communicated” to Doral by words, acts, or deeds that the interim servicing period had commenced under Section 2.6-and thus irrespective of whether the Effective Date provision was trig *36 gered — we agree with the district court that Doral’s forecast of damages under Section 1.1, which is over 87 times greater than Doral’s actual damages, fails to provide a reasonable forecast of Doral’s loss. Accordingly, we conclude, as the district court concluded, that the liquidated damages established by Section 1.1 are properly characterized as an unenforceable penalty-
A.
Initially, Doral argues that the “Effective Date” provision under Section 2.6 has no meaning which is separate and distinct from the July 11, 2008 effective date clause on the face of the ISA. We disagree.
“If the terms of the contract are clear and unambiguous, then we must afford those terms their plain and ordinary meaning; however, if the terms are vague or ambiguous, then we may consider extrinsic evidence to interpret those provisions.”[3] Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir.2000) (citing Shoup v. Shoup, 31 Va.App. 621, 525 S.E.2d 61, 63-64 (2000)).
The first step for a court asked to grant summary judgment based on a contract’s interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue.
Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1126 (4th Cir.1993) (citation omitted). An unambiguous contract should be construed by the Court as a matter of law, without reference to extrinsic evidence. See World-Wide Rights Ltd. P’ship v. Combe Inc., 955 F.2d 242, 245 (4th Cir.1992). The proper interpretation of a clear and unambiguous contract is that which assigns the plain and ordinary meaning to the contract terms. See Providence Square Assocs., 211 F.3d at 850.
Under Section 2.6 of the ISA, the “effective date for commencement of the servicing of Mortgages (Effective Date)” would be determined and communicated by Freddie Mac. J.A. 33. Although the ISA was “effective” July 11, 2008, the date on which it was signed, ISA Section 2.6 specifically provides for the establishment of a separate “Effective Date” on which Doral would actually commence servicing the R & G loans for Freddie Mac and begin to earn servicing compensation fees. As the district court pointed out in its Memorandum Opinion, “the role that the ‘effective date’ under Section 2.6 plays with respect to certain rights, duties and obligations on the part of Doral, apart from Section 1.1, makes clear that the parties contemplated the ‘effective date’ as a date communicated to Doral as the start of its obligations with respect to the servicing of the loan portfolio.” J.A. 1532
We agree with the district court that Section 2.6 is unambiguous, and that the only reasonable interpretation of Section 2.6-and the ISA as a whole — is that the *37 parties intended the “Effective Date” to “be a date that Freddie Mac would communicate to Doral as the date when Doral would begin its servicing obligations.” Id. It was “not just the date on which Freddie Mac [told] Doral that it will at some point be the interim servicer.” Id. Because we find that the language of the ISA and Section 2.6 in particular, is clear and unambiguous, we must disregard extrinsic evidence. See Providence Square Assocs., 211 F.3d at 850.
B.
Next, Doral contends that, even if this Court upholds the district court’s interpretation that a separate “Effective Date” communication from Freddie Mac to Doral was required under Section 2.6 of the ISA, this Court should nevertheless conclude that Freddie Mac did in fact determine and communicate the Effective Date to Doral. Doral further contends that such communication triggered the parties’ rights and obligations under, among other provisions, Section .1.1, which includes Freddie Mac’s obligation to pay Doral an amount equivalent to twenty-four months of service compensation fees in the event of early termination. Doral argues on appeal that the district court’s finding that there were genuine issues of material fact “concerning whether Freddie Mac, through word or deed, ‘communicated’ a date that would serve as the ‘Effective Date’ for the purposes of [ISA Section] 2.6,” J.A. 1532-33, cannot be reconciled with Freddie Mac’s actions and statements after July 11, 2008, when the ISA became effective.[4] We disagree.
Indeed, as explained below, the district court’s relevant conclusion of law — namely, that Freddie Mac’s potential liability to pay liquidated damages to Doral under Section 1.1 is an unenforceable penalty— may be reconciled both with circumstances where Freddie Mac determined and communicated the Effective Date to Doral, as well as with circumstances where no such Effective Date was determined or communicated by Freddie Mac. Given that the district court concluded, as we conclude today, that the liquidated damages established by Section 1.1 are, as a matter of law, an unenforceable penalty, it follows that whether Freddie Mac did, as a matter of fact, determine and communicate the Effective Date to Doral is not material to either the district court’s legal conclusions and our holding today.
Thus, regardless of Doral’s contentions, there is no need to address the merits of Doral’s arguments of whether Freddie Mac communicated to Doral an Effective Date. Even assuming, arguen-do — as the district court assumed — that the twenty-four month servicing fee provision of Section 1.1 was triggered, we find — as the district court found — that, as a matter of law, the provision would amount to an unenforceable penalty.
1.
As a threshold matter, Doral contends the district court erred in concluding that *38 Section 1.1 of the ISA is a liquidated damage provision, which is subject, under appropriate circumstances, to characterization as an unenforceable penalty. Instead, Doral asks this Court to construe Section 1.1 as a provision establishing, among other things, an “alternative performance contract.” We decline to do so.[5]
“[T]he primary objective of an alternative contract is performance, and it thus looks to a continuation of the relationship between the parties, rather than its termination, whereas a liquidated damages provision provides for an agreed result to follow from nonperformance.” 24 Williston on Contracts § 65:7 (4th ed.); see also In the Matter of Cmty. Med. Ctr., 623 F.2d 864, 867 (3rd Cir.1980) (explaining that, in an alternative performance contract, “either one of two performances may be given by the promisor and received by the promisee as the agreed exchange for the return performance by the promisee”).
Here, Section 1.1 of the ISA cannot reasonably be construed as a provision that “looks to a continuation of the relationship.” By its terms, this provision would apply only if Freddie Mac were to terminate the ISA by transferring the Interim Portfolio away from Doral after com-meneement of servicing but before it has had an opportunity to service the loans for the full twenty-four month period. Rather than an alternative performance provision, we agree with the district court’s finding that Section 1.1 plainly reflects the parties’ advance agreement to a liquidated sum that Freddie Mac would owe to Doral, under certain conditions, for its termination of Doral’s servicing of the portfolio before expiration of a twenty-four month term under the ISA. See Williston on Contracts § 65:7 (“[0]ne of the principal characteristics of a stipulated damages provision is that it is agreed upon in advance by the parties as a remedy for breach. This characteristic provides the basis on which a liquidated damages provision is distinguishable from provisions for alternative performance of a contract, which are otherwise similar.”)[6]
2.
Next, in the alternative, Doral asserts that even if Section' 1.1 is a liquidated damages clause, the district court erred by finding this provision to be an unenforceable penalty. Doral argues that in granting summary judgment to Freddie Mac, the district court erred by requiring Doral to *39 present detailed support for its damage estimates. We disagree.
We review the district court’s “determination de novo as to whether a contractual provision is an unenforceable penalty, unconscionable, or void on account of public policy.” NML Capital v. Republic of Argentina, 621 F.3d 230, 236 (2d. Cir.2010) (internal citations omitted); see also Midwest Oilseeds, Inc. v. Limagrain Genetics Corp., 387 F.3d 705, 715 (8th Cir.2004) (“[T]he question whether a contract provision is a valid liquidated damages provision or an unenforceable penalty is a question of law for the court.” (citation omitted)); Colorado Interstate Corp. v. CIT Group/Equip. Finan., Inc., 993 F.2d 743, 751 (10th Cir.1993) (“[T]he determination of whether a contractual provision is an unenforceable penalty is a matter of law.” (citation omitted)); see also Scarborough v. Ridgeway, 726 F.2d 132, 135 (4th Cir.1984) (“[I]nterpretation of a written contract is a question of law subject to de novo appellate review.” (citation omitted)).[7]
“To recover damages in any case, a plaintiff must prove with reasonable certainty the amount of his damages and the cause from which they resulted.” Parkridge Phase Two Assocs. v. Lockheed Martin Corp., 172 F.3d 44, 1999 WL 44173, *2 (4th Cir.1999) (unpublished) (citing Hale v. Fawcett, 214 Va. 583, 202 S.E.2d 923, 925 (Va.1974)).
Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.
Restatement (Second) of Contracts § 356.[8] If a liquidated damages provision is intended to punish a party for breach, the provision is unenforceable. Id. at § 356, cmt. a; see also Comstock Potomac Yard, L.C. v. Balfour Beatty Const., LLC, 694 F.Supp.2d 468, 484 (E.D.Va.2010) (“Under Virginia law, a clause for liquidated damages ‘will be construed as a penalty when the damage resulting from a breach of contract is susceptible of definite measurement, or where the stipulated amount would be grossly in excess of actual damages.’” (quoting Brooks v. Bankson, 248 Va. 197, 208, 445 S.E.2d 473 (1994))); see also WRH Mortg., Inc. v. S.A.S. Assocs., 214 F.3d 528, 534 (4th Cir.2000) (“[C]on-tract provisions calling for breach of contract damages grossly in excess of actual damages generally are unenforceable as penalties or forfeitures.” (citation omitted)).
Here, Doral’s forecast of evidence of its damages pursuant to Section 1.1 consisted of a model that it created to calculate its *40 anticipated servicing compensation fees.[9] The model multiplied the per-loan servicing fee, as specified in Exhibit C to the ISA, by the number of loans in the portfolio, with an assumption of an annual thirteen percent decrease in the number of loans in the portfolio from year one to year two. Doral asserts that the sum of this formula, $10,876,954, encompasses the agreed damages under Section 1.1 for twenty-four months. Bearing in mind that Doral’s actual damages, as calculated by Doral, total a mere $124,588, Doral’s model mandates damages that are 87.3 times greater than Doral’s own estimate of its actual damages. Notably, only five days elapsed between the execution of the ISA and the date of a TRO that prohibited Freddie Mac from transferring the portfolio to Doral. Moreover, given that the servicing had not yet begun, the Section 1.1 penalties were in their most extreme form (e.g., as compared to a hypothetical termination of the ISA after twenty-one months of servicing, which under Section 1.1 would have required Freddie Mac to pay Doral for only three months of servicing fees).
Furthermore, it appears from the record that Doral seeks an award without a reduction based on its estimated costs associated with servicing the loan portfolio. The district court pointed out that “incurred but unrecovered out of pocket costs can be determined and in fact, Doral makes such a claim in the amount of $124,588.” J.A. 1538. We agree with the district court that Doral’s forecast of its damages under Section 1.1, which would award Doral twenty-four months of servicing compensation fees without any reduction for Doral’s costs and expenses, amounts to an unenforceable penalty.
Thus, even if Section 1.1 is applied, and it is assumed that the “Effective Date” in Section 2.6 was triggered by the acts and deeds of Freddie Mac, Doral’s forecast of damages pursuant to Doral’s own model posits that Doral would reap a windfall exceeding $10 million in damages without any deduction for expenses.[10] Any such recovery would be grossly out of proportion to Doral’s actual incurred costs of $124,588, and far in excess of what it might have reasonably expected to earn if it had actually incurred the significant cost of servicing more than 46,000 loans for a period of twenty-four months. In sum, Doral has failed to present a reasonable forecast of the loss caused by the breach. See Kraft Foods N. Am., Inc. v. Banner Eng’g Sales, Inc., 446 F.Supp.2d 551, 573 (E.D.Va.2006).
III.
For the foregoing reasons, we affirm summary judgment as to Doral’s breach of contract claim and damages entered in favor of Doral in the amount of $124,588.

AFFIRMED

. Freddie Mac is a corporate instrumentality of the United States chartered by Congress in 1970. See 12 U.S.C. §§ 1451-59.

. On July 14, 2008, unbeknownst to Freddie Mac, R & G filed an action under seal in the U.S. District Court for the District of Puerto Rico to obtain the ex parte TRO. See R & G Mortg. Corp. v. Fed. Home Loan Mortg. Corp., 584 F.3d 1, 6 (1st Cir.2009).

. ISA Section 2.26 provides that the ISA is "governed by and construed in accordance with the law of the United States. Insofar as there may be no applicable precedent, then Virginia laws are deemed reflective of the federal law.” J.A. 40. Neither the validity nor the interpretation of the ISA’s choice of law provision is at issue on appeal. We note that, under federal common law, contracts are interpreted under “standard principles of contract law-more precisely, the core principles of the common law of contract that are in force in most states.” S & O Liquidating P’ship v. C.I.R., 291 F.3d 454, 459 (7th Cir.2002) (quoting United States v. Nat. Steel Corp., 75 F.3d 1146, 1150 (7th Cir.1996)).

. According to Doral, Freddie Mac determined and communicated the Effective Date for the purposes of Section 1.1:(1) as early as July 11, 2008, when the ISA was executed; or (2) no later than July 14, 2008, when Doral was told to appear with Freddie Mac at the offices of R & G to begin the process of transferring the portfolio; or (3) in no event later than July 15, 2008, when Doral continued to meet with Freddie Mac and plan for the transfer of the portfolio from R & G to Doral. As explained, resolution of Doral's factual allegations is not material to the legal conclusion of the district court, as well as our holding today, that the liquidated damages established by Section 1.1 are an unenforceable penalty.

. The dissent's characterization of Section 1.1 as an alternative performance provision that must be enforced if the "Effective Date” was communicated to Doral is misplaced. To the extent that Freddie Mac did communicate the "Effective Date,” under the ISA’s express terms, Doral is specifically precluded from recovering 24 months of damages. Section 1.1 provides: "Freddie Mac shall not be responsible for this [24-month damage] fee if [Freddie Mac] is ordered by [a] court to transfer the Interim Portfolio from [Doral] before the expiration of 24 months.” Here, of course, Freddie Mac's decision was not based on an economic calculus — as the dissent suggests — but rather a TRO (issued by the United States District Court for the District of Puerto Rico) prohibiting Freddie Mac from terminating its servicing agreement with R & G and transferring the portfolio to Doral. See R & G Mortg. Corp., 584 F.3d at 6. As a consequence, the dissent’s characterization of Section 1.1 as an alternative performance provision does not change the outcome and, therefore, this matter was properly resolved by the district court on summary judgment.

. Doral also asserts that Section 1.1 is simply a "contractual option.” According to Doral, the ISA thus provides for an option allowing Freddie Mac's early termination of the contract without breach subject to its payment of compensation to Doral pursuant to Section 1.1. The district court, however, declined to interpret Section 1.1 as a contractual option. We agree, as the language of Section 1.1 does not support Doral’s contention.

. Virginia law also treats the question of whether a contractual provision is an unenforceable penalty as a matter of law. See Teachers’ Ret. Sys. v. Am. Title Guar. Corp., 1996 WL 1065475, *2 (Va.Cir.Ct.1996) ("Because this particular clause calls for damages in excess of Plaintiff’s actual damages, I find that, as a matter of law, it constitutes an unenforceable penalty.”); cf. Perez v. Capital One Bank, 258 Va. 612, 522 S.E.2d 874, 875-76 (1999) ("[W]hen the damages caused by the breach are prone to definite measurement or when the stipulated amount would grossly exceed actual damages, courts of law usually construe such a provision as an unenforceable penalty.” (citation omitted)).

. Federal courts use the Restatement of Contracts in determining federal common law of contracts. In re Peanut Crop Ins. Litig., 524 F.3d 458, 470 (4th Cir.2008) ("The Restatement of Contracts reflects many of the contract principles of federal common law.” (quoting Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1245 (Fed.Cir.2007))).

. During negotiations with Freddie Mac, Doral instructed its then-Senior Vice President of Investor Relations, Roberto Reyna, to create a model projecting revenue, expenses, and profits associated with servicing the Interim Portfolio for two years.

. In addition to expenses of $124,588 that Doral actually incurred in preparing to service the loan portfolio, it contends that it is entitled to service compensation fees of $10,876,954 for the twenty-four month period under the ISA, ancillary fees it would have earned from late and back check fees of $3,776,376 and the expense of remaining on hold after the TRO per Freddie Mac’s request. Similar to its holding that the model was inadequate, the district court found Doral’s figures with regards to these claims to be speculative and unsupported by the facts in the record.