**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-2245**

DORAL BANK PR,

                Plaintiff - Appellant,

     v.

FEDERAL HOME LOAN MORTGAGE CORPORATION,

                Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Anthony J. Trenga, District Judge. (1:09-cv-01420-AJT-JFA)

Argued: December 8, 2011          Decided: April 10, 2012

Before DUNCAN, DAVIS, and WYNN, Circuit Judges.

Affirmed by unpublished opinion. Judge Wynn wrote the majority opinion, in which Judge Duncan concurred. Judge Davis wrote a dissenting opinion.

**ARGUED:** Charles Andrew Patrizia, PAUL HASTINGS LLP, Washington, D.C., for Appellant. William G. Ballaine, LANDMAN, CORSI, BALLAINE & FORD, PC, New York, New York, for Appellee. **ON BRIEF:** Stephen B. Kinnaird, James E. Anklam, Igor V. Timofeyev, PAUL HASTINGS LLP, Washington, D.C., for Appellant. Kenton W. Hambrick, Associate General Counsel, FEDERAL HOME LOAN MORTGAGE CORPORATION, McLean, Virginia; Mark S. Landman, LANDMAN, CORSI, BALLAINE & FORD, PC, New York, New York, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

Under an Interim Servicing Agreement ("ISA") Doral Bank PR ("Doral") agreed to take over the servicing of a portfolio of mortgages ("portfolio") owned by the Federal Home Loan Mortgage Corporation ("Freddie Mac"). However, because the existing servicer of the portfolio brought court actions that restrained Freddie Mac from transferring the portfolio to Doral, Freddie Mac terminated the ISA. Thereafter, Doral brought this action alleging that Freddie Mac breached the ISA by, among other things, failing to pay to Doral, pursuant to a provision in the ISA, an amount equivalent to twenty-four months of Doral's anticipated service compensation fees under the ISA.

Upon consideration of cross-motions for summary judgment, the district court agreed with Freddie Mac that Doral's damages were limited to its actual damages in the amount of $124,588. The district court therefore denied Doral's claim for twenty-four months of service compensation fees reasoning that, in light of Doral's forecast of evidence on damages, the ISA's provision for liquidated damages amounted to an unenforceable penalty. For the reasons below, we affirm.

Freddie Mac engages pre-approved lenders ("servicers") to service its portfolio of mortgages.[1] The servicer performs day-to-day activities such as collecting payments from borrowers, accounting for and remitting borrowers' principal and interest payments to Freddie Mac, and maintaining tax and insurance escrows to pay borrowers' taxes and insurance. Since 1986, Doral, a commercial bank organized and operating under the laws of the Commonwealth of Puerto Rico, has been a qualified servicer of Freddie Mac's mortgages.

This matter arose in 2008, when Freddie Mac began implementing its plans to terminate its servicing relationship with R&G Mortgage Corporation and R-G Premier Bank of Puerto Rico (collectively, "R&G"). On July 9, 2008, Freddie Mac and Doral initiated negotiations for Doral to step in for R&G and serve as Freddie Mac's "interim servicer" on a portfolio comprising approximately 46,000 Freddie Mac loans with a total value of over $3.8 billion, which, up to that point in time, had been serviced by R&G. Accordingly, on July 11, 2008, Freddie Mac officially informed R&G that it was being terminated as its servicer of this portfolio. On that same date, Freddie Mac and

---

[1] Freddie Mac is a corporate instrumentality of the United States chartered by Congress in 1970. See 12 U.S.C. §§ 1451-59.

4

Doral entered into the ISA under the terms of which Doral agreed to be its interim servicer of the same portfolio.

The terms of the ISA indicate two dates relevant to this appeal. First, in the opening paragraph of the ISA, the terms indicate that the ISA was "effective" July 11, 2008. J.A. 30. Second, in Section 2.6 of the ISA, "Effective Date" is defined as:

> The effective date for commencement of the servicing of the Mortgages ("Effective Date") by the Interim Servicer [Doral] shall be a date that Freddie Mac determines and communicates to the Interim Servicer that Interim Servicer will be servicing the Interim Portfolio. The Effective Date, when possible, will correspond to a date when Interim Servicer obtains the files for the Mortgages.

Id. at 33. Additionally, the ISA defined the "Interim Portfolio" as "[t]he portfolio of Freddie Mac loans that were once serviced by a terminated servicer." Id. at 30.

On July 11 and 12, 2008, a Freddie Mac team met with Doral representatives. The Freddie Mac team advised Doral to have personnel ready on Monday, July 14, 2008 to go with Freddie Mac personnel to R&G's offices to discuss a plan to initiate a transfer to Doral of the loans R&G was servicing for Freddie Mac. On July 14, 2008, Freddie Mac representatives, led by Russell McKoy, Freddie Mac's file recovery team leader, went to R&G's main offices to meet with R&G management. Although a Doral representative accompanied Freddie Mac employees, he was

5

told by a Freddie Mac representative to wait outside, while Freddie Mac spoke with R&G. Consequently, Doral did not join Freddie Mac and R&G for these discussions.

On July 15, 2008, Freddie Mac returned to R&G's offices, and during the course of the meeting, Doral representatives were invited to join. At this meeting, R&G's representatives indicated they would not be able to provide data on the R&G loans that day and requested that Freddie Mac give R&G an additional day to compile the servicing files and the mortgage notes to give to Doral.

Later that day, Freddie Mac was served an ex parte temporary restraining order ("TRO") issued by the U.S. District Court for the District of Puerto Rico, prohibiting Freddie Mac from terminating its servicing agreement with R&G and from transferring the portfolio.[2] That same day, Freddie Mac's associate general counsel spoke by telephone with a Doral attorney and a senior Doral executive, advising that all efforts to transfer servicing were on hold because a TRO had been issued against Freddie Mac. On July 17, 2008, Freddie Mac sent formal notification, which confirmed that, because of the TRO, the

---

[2] On July 14, 2008, unbeknownst to Freddie Mac, R&G filed an action under seal in the U.S. District Court for the District of Puerto Rico to obtain the ex parte TRO. See R&G Mortg. Corp. v. Fed. Home Loan Mortg. Corp., 584 F.3d 1, 6 (1st Cir. 2009).

transferring of the Interim Portfolio from R&G to Doral was on hold. Notably, at no time were any R&G loan files, documents, or electronic data transferred from R&G to Doral during the five-day period spanning from July 11 through July 15, 2008.

On July 22, 2008, the district court converted the scheduled July 23 preliminary injunction hearing into a settlement conference. Ultimately, Freddie Mac and R&G entered into a settlement agreement, signed by the district court, allowing R&G to continue to service Freddie Mac mortgages until R&G could sell its servicing rights to a qualified third-party buyer. See R&G Mortg. Corp. v. Fed. Home Loan Mortg. Corp., 584 F.3d 1, 6 (1st Cir. 2009). Because of these events, Freddie Mac never transferred the R&G portfolio to Doral.

On August 14, 2008, Doral wrote to R&G, informing R&G that it would move to intervene in R&G's pending action against Freddie Mac unless it was given a copy of the TRO. R&G refused this request via e-mail, explaining that paperwork in the case was under seal. "The e-mail advised that Doral's [ISA] was not directly at issue in the litigation but that, insofar as that agreement pertained to R&G's portfolio of Freddie Mac mortgages, the TRO rendered Doral 'unable to perform.'" Id. Thereafter, Doral attempted to intervene in the R&G action. Doral based its attempted intervention on its alleged contractual rights under

7

the ISA.  Doral's intervention motion was denied, and the denial was affirmed on appeal.  Id. at 12-13.

In early August 2008, Freddie Mac asked Doral to provide it with the costs incurred by Doral under the ISA; and on August 5, 2008, Doral transmitted to Freddie Mac its costs incurred figures, which totaled $124,588.  On or about August 13, 2008, Freddie Mac formally informed Doral that the R&G loans would not be transferred to Doral for interim servicing under the ISA.  Thereafter, Freddie Mac offered to reimburse Doral for its costs under the ISA in the amount of $124,588, as well as an additional sum equivalent to forty percent of Doral's costs.

Doral, in turn, claimed that it was entitled to twenty-four months of service compensation fees under the ISA, which provided at Section 1.1 that:

> Interim Servicer [Doral] agrees to provide servicing for such Interim Portfolio until such time as Freddie Mac determines to transfer servicing of such Interim Portfolio.  Unless the Interim Portfolio is transferred pursuant to court order or the Interim Servicers eleibility [sic] to sell mortgages to or service mortgages for Freddie Mac is suspended or terminated pursuant to section 1.3 [of the ISA], the length of interim servicing will not be less than 24 months.  If the length of interim servicing is less than 24 months, then Freddie Mac will pay to Interim Servicer the total of 24 months of servicing compensation fee minus the number of months already billed by Interim Servicer. Freddie Mac shall not be responsible for this fee if it is ordered by court to transfer the Interim Portfolio from the Interim Servicer before the expiration of 24 months or if Freddie Mac terminates or suspends the eligibility of

8

the Interim Servicer to sell mortgages to or service mortgages for Freddie Mac pursuant to section 1.3.

J.A. 30.    In response, Freddie Mac rejected Doral's claim for damages under Section 1.1, arguing that the "Effective Date" provision under Section 2.6—i.e., the "effective date for commencement of the servicing of the Mortgages"—had not occurred.    Specifically, Freddie Mac maintained that the obligations and liabilities in Section 1.1 were not triggered because Freddie Mac never "determine[d] and communicate[d] to [Doral] that [Doral] w[ould] be servicing the Interim Portfolio," as required by Section 2.6.  J.A. 33.

On December 29, 2009, Doral brought an action in the Eastern District of Virginia alleging that Freddie Mac either partially or totally breached the ISA "by failing to pay Doral the servicing compensation fees due to Doral" for twenty-four months.    Doral also asked for a declaration of the respective rights of Doral and Freddie Mac.    J.A. 27.    Freddie Mac responded by moving to dismiss Doral's complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief could be granted.    The district court denied Freddie Mac's motion, concluding that it was unable to determine the parties' contractual intent from the face of the ISA, that discovery regarding the circumstances of the transaction was appropriate, and that custom and practice

9

evidence might be relevant to understanding the parties' obligations under the ISA.

Following discovery, Doral filed an amended complaint, which left unchanged its contractual claims but amended certain factual allegations. After Freddie Mac answered the amended complaint, the parties filed cross-motions for summary judgment on both liability and damages. The district court granted summary judgment in favor of Doral as to its liability claims for breach of contract and as to its damage claims to the extent of $124,588, but denied claims as to all other damages (including, specifically, servicing fees, ancillary fees, and "on hold" costs). Freddie Mac's motion for summary judgment was denied as to liability but granted as to all damages other than the amount of $124,588. Doral's claim for declaratory relief was dismissed. Doral appealed.

## II.

This Court reviews the district court's decision granting summary judgment de novo. See Cont'l Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 508 (4th Cir. 2002). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

10

judgment as a matter of law." Fed. R. Civ. P. Rule 56(c). Summary judgment is appropriate only if there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

Doral argues on appeal that the district court erred by misreading ISA Section 2.6 to require a separate communication of an "Effective Date" and by failing to find—if such a separate communication was required—that such communication was given. We disagree. As further explained below, we conclude that: (1) the ISA unambiguously creates—as the district court found—an "Effective Date" under Section 2.6 for the purposes of commencement of the interim servicing rights and obligations of Doral and Freddie Mac, which is separate and distinct from the ISA's "effective date" for other contractual obligations, including, for example, rights and obligations during the pre-servicing period (e.g., Freddie Mac's obligations to reimburse Doral for actual expenses incurred during this pre-servicing period under Section 2.5(c) of the ISA); and (2) irrespective of whether Freddie Mac "determined and communicated" to Doral by words, acts, or deeds that the interim servicing period had commenced under Section 2.6—and thus irrespective of whether the Effective Date provision was triggered—we agree with the district court that Doral's forecast of damages under Section

11

1.1, which is over 87 times greater than Doral's actual damages, fails to provide a reasonable forecast of Doral's loss. Accordingly, we conclude, as the district court concluded, that the liquidated damages established by Section 1.1 are properly characterized as an unenforceable penalty.

A.

Initially, Doral argues that the "Effective Date" provision under Section 2.6 has no meaning which is separate and distinct from the July 11, 2008 effective date clause on the face of the ISA. We disagree.

"If the terms of the contract are clear and unambiguous, then we must afford those terms their plain and ordinary meaning; however, if the terms are vague or ambiguous, then we may consider extrinsic evidence to interpret those provisions."[3] Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846,

---

[3] ISA Section 2.26 provides that the ISA is "governed by and construed in accordance with the law of the United States. Insofar as there may be no applicable precedent, then Virginia laws are deemed reflective of the federal law." J.A. 40. Neither the validity nor the interpretation of the ISA's choice of law provision is at issue on appeal. We note that, under federal common law, contracts are interpreted under "standard principles of contract law-more precisely, the core principles of the common law of contract that are in force in most states." S & O Liquidating P'ship v. C.I.R., 291 F.3d 454, 459 (7th Cir. 2002) (quoting United States v. Nat. Steel Corp., 75 F.3d 1146, 1150 (7th Cir. 1996)).

850 (4th Cir. 2000) (citing Shoup v. Shoup, 31 Va. App. 621, 525 S.E.2d 61, 63-64 (2000)).

> The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue.

Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1126 (4th Cir. 1993) (citation omitted). An unambiguous contract should be construed by the Court as a matter of law, without reference to extrinsic evidence. See World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992). The proper interpretation of a clear and unambiguous contract is that which assigns the plain and ordinary meaning to the contract terms. See Providence Square Assocs., 211 F.3d at 850.

Under Section 2.6 of the ISA, the "effective date for commencement of the servicing of Mortgages (Effective Date)" would be determined and communicated by Freddie Mac. J.A. 33. Although the ISA was "effective" July 11, 2008, the date on which it was signed, ISA Section 2.6 specifically provides for the establishment of a separate "Effective Date" on which Doral would actually commence servicing the R&G loans for Freddie Mac and begin to earn servicing compensation fees. As the district court pointed out in its Memorandum Opinion, "the role that the

13

'effective date' under Section 2.6 plays with respect to certain rights, duties and obligations on the part of Doral, apart from Section 1.1, makes clear that the parties contemplated the 'effective date' as a date communicated to Doral as the start of its obligations with respect to the servicing of the loan portfolio." J.A. 1532

We agree with the district court that Section 2.6 is unambiguous, and that the only reasonable interpretation of Section 2.6–and the ISA as a whole—is that the parties intended the "Effective Date" to "be a date that Freddie Mac would communicate to Doral as the date when Doral would begin its servicing obligations." Id. It was "not just the date on which Freddie Mac [told] Doral that it will at some point be the interim servicer." Id. Because we find that the language of the ISA and Section 2.6 in particular, is clear and unambiguous, we must disregard extrinsic evidence. See Providence Square Assocs., 211 F.3d at 850.

B.

Next, Doral contends that, even if this Court upholds the district court's interpretation that a separate "Effective Date" communication from Freddie Mac to Doral was required under Section 2.6 of the ISA, this Court should nevertheless conclude that Freddie Mac did in fact determine and communicate the

14

Effective Date to Doral. Doral further contends that such communication triggered the parties' rights and obligations under, among other provisions, Section 1.1, which includes Freddie Mac's obligation to pay Doral an amount equivalent to twenty-four months of service compensation fees in the event of early termination. Doral argues on appeal that the district court's finding that there were genuine issues of material fact "concerning whether Freddie Mac, through word or deed, 'communicated' a date that would serve as the 'Effective Date' for the purposes of [ISA Section] 2.6," J.A. 1532-33, cannot be reconciled with Freddie Mac's actions and statements after July 11, 2008, when the ISA became effective.[4] We disagree.

Indeed, as explained below, the district court's relevant conclusion of law—namely, that Freddie Mac's potential liability to pay liquidated damages to Doral under Section 1.1 is an unenforceable penalty—may be reconciled both with circumstances

---

[4] According to Doral, Freddie Mac determined and communicated the Effective Date for the purposes of Section 1.1: (1) as early as July 11, 2008, when the ISA was executed; or (2) no later than July 14, 2008, when Doral was told to appear with Freddie Mac at the offices of R&G to begin the process of transferring the portfolio; or (3) in no event later than July 15, 2008, when Doral continued to meet with Freddie Mac and plan for the transfer of the portfolio from R&G to Doral. As explained, resolution of Doral's factual allegations is not material to the legal conclusion of the district court, as well as our holding today, that the liquidated damages established by Section 1.1 are an unenforceable penalty.

15

where Freddie Mac determined and communicated the Effective Date to Doral, as well as with circumstances where no such Effective Date was determined or communicated by Freddie Mac. Given that the district court concluded, as we conclude today, that the liquidated damages established by Section 1.1 are, as a matter of law, an unenforceable penalty, it follows that whether Freddie Mac did, as a matter of fact, determine and communicate the Effective Date to Doral is not material to either the district court's legal conclusions and our holding today.

Thus, regardless of Doral's contentions, there is no need to address the merits of Doral's arguments of whether Freddie Mac communicated to Doral an Effective Date. Even assuming, arguendo—as the district court assumed—that the twenty-four month servicing fee provision of Section 1.1 was triggered, we find—as the district court found—that, as a matter of law, the provision would amount to an unenforceable penalty.

1.

As a threshold matter, Doral contends the district court erred in concluding that Section 1.1 of the ISA is a liquidated damage provision, which is subject, under appropriate circumstances, to characterization as an unenforceable penalty. Instead, Doral asks this Court to construe Section 1.1 as a

16

provision establishing, among other things, an "alternative performance contract." We decline to do so.[5]

"[T]he primary objective of an alternative contract is performance, and it thus looks to a continuation of the relationship between the parties, rather than its termination, whereas a liquidated damages provision provides for an agreed result to follow from nonperformance." 24 Williston on Contracts § 65:7 (4th ed.); see also In the Matter of Cmty. Med. Ctr., 623 F.2d 864, 867 (3rd Cir. 1980) (explaining that, in an alternative performance contract, "either one of two performances may be given by the promisor and received by the promisee as the agreed exchange for the return performance by the promisee").

---

[5] The dissent's characterization of Section 1.1 as an alternative performance provision that must be enforced if the "Effective Date" was communicated to Doral is misplaced. To the extent that Freddie Mac did communicate the "Effective Date," under the ISA's express terms, Doral is specifically precluded from recovering 24 months of damages. Section 1.1 provides: "Freddie Mac shall not be responsible for this [24-month damage] fee if [Freddie Mac] is ordered by [a] court to transfer the Interim Portfolio from [Doral] before the expiration of 24 months." Here, of course, Freddie Mac's decision was not based on an economic calculus—as the dissent suggests—but rather a TRO (issued by the United States District Court for the District of Puerto Rico) prohibiting Freddie Mac from terminating its servicing agreement with R&G and transferring the portfolio to Doral. See R&G Mortg. Corp., 584 F.3d at 6. As a consequence, the dissent's characterization of Section 1.1 as an alternative performance provision does not change the outcome and, therefore, this matter was properly resolved by the district court on summary judgment.

17

Here, Section 1.1 of the ISA cannot reasonably be construed as a provision that "looks to a continuation of the relationship." By its terms, this provision would apply only if Freddie Mac were to terminate the ISA by transferring the Interim Portfolio away from Doral after commencement of servicing but before it has had an opportunity to service the loans for the full twenty-four month period. Rather than an alternative performance provision, we agree with the district court's finding that Section 1.1 plainly reflects the parties' advance agreement to a liquidated sum that Freddie Mac would owe to Doral, under certain conditions, for its termination of Doral's servicing of the portfolio before expiration of a twenty-four month term under the ISA. See Williston on Contracts § 65:7 ("[O]ne of the principal characteristics of a stipulated damages provision is that it is agreed upon in advance by the parties as a remedy for breach. This characteristic provides the basis on which a liquidated damages provision is distinguishable from provisions for alternative performance of a contract, which are otherwise similar.")[6]

---

[6] Doral also asserts that Section 1.1 is simply a "contractual option." According to Doral, the ISA thus provides for an option allowing Freddie Mac's early termination of the contract without breach subject to its payment of compensation to Doral pursuant to Section 1.1. The district court, however, declined to interpret Section 1.1 as a contractual option. We
(Continued)

18

Next, in the alternative, Doral asserts that even if Section 1.1 is a liquidated damages clause, the district court erred by finding this provision to be an unenforceable penalty. Doral argues that in granting summary judgment to Freddie Mac, the district court erred by requiring Doral to present detailed support for its damage estimates. We disagree.

We review the district court's "determination de novo as to whether a contractual provision is an unenforceable penalty, unconscionable, or void on account of public policy." NML Capital v. Republic of Argentina, 621 F.3d 230, 236 (2d. Cir. 2010) (internal citations omitted); see also Midwest Oilseeds, Inc. v. Limagrain Genetics Corp., 387 F.3d 705, 715 (8th Cir. 2004) ("[T]he question whether a contract provision is a valid liquidated damages provision or an unenforceable penalty is a question of law for the court." (citation omitted)); Colorado Interstate Corp. v. CIT Group/Equip. Finan., Inc., 993 F.2d 743, 751 (10th Cir. 1993) ("[T]he determination of whether a contractual provision is an unenforceable penalty is a matter of law." (citation omitted)); see also Scarborough v. Ridgeway, 726 F.2d 132, 135 (4th Cir. 1984) ("[I]nterpretation of a written

---

agree, as the language of Section 1.1 does not support Doral's contention.

19

contract is a question of law subject to de novo appellate review." (citation omitted)).[7]

"To recover damages in any case, a plaintiff must prove with reasonable certainty the amount of his damages and the cause from which they resulted." Parkridge Phase Two Assocs. v. Lockheed Martin Corp., 172 F.3d 44, 1999 WL 44173, *2 (4th Cir. 1999) (unpublished) (citing Hale v. Fawcett, 214 Va. 583, 202 S.E.2d 923, 925 (Va. 1974)).

> Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

Restatement (Second) of Contracts § 356.[8] If a liquidated damages provision is intended to punish a party for breach, the

---

[7] Virginia law also treats the question of whether a contractual provision is an unenforceable penalty as a matter of law. See Teachers' Ret. Sys. v. Am. Title Guar. Corp., 1996 WL 1065475, *2 (Va. Cir. Ct. 1996) ("Because this particular clause calls for damages in excess of Plaintiff's actual damages, I find that, as a matter of law, it constitutes an unenforceable penalty."); cf. Perez v. Capital One Bank, 522 S.E.2d 874, 875-76 (Va. 1999) ("[W]hen the damages caused by the breach are prone to definite measurement or when the stipulated amount would grossly exceed actual damages, courts of law usually construe such a provision as an unenforceable penalty." (citation omitted)).

[8] Federal courts use the Restatement of Contracts in determining federal common law of contracts. In re Peanut Crop Ins. Litig., 524 F.3d 458, 470 (4th Cir. 2008) ("The Restatement of Contracts reflects many of the contract principles of federal (Continued)

provision is unenforceable.  Id. at § 356, cmt. a; see also

Comstock Potomac Yard, L.C. v. Balfour Beatty Const., LLC, 694

F. Supp. 2d 468, 484 (E.D.Va. 2010) ("Under Virginia law, a

clause for liquidated damages 'will be construed as a penalty

when the damage resulting from a breach of contract is

susceptible of definite measurement, or where the stipulated

amount would be grossly in excess of actual damages.'" (quoting

Brooks v. Bankson, 248 Va. 197, 208, 445 S.E.2d 473 (1994)); see

also WRH Mortg., Inc. v. S.A.S. Assocs., 214 F.3d 528, 534 (4th

Cir. 2000) ("[C]ontract provisions calling for breach of

contract damages grossly in excess of actual damages generally

are unenforceable as penalties or forfeitures." (citation

omitted)).

Here, Doral's forecast of evidence of its damages pursuant

to Section 1.1 consisted of a model that it created to calculate

its anticipated servicing compensation fees.[9]  The model

multiplied the per-loan servicing fee, as specified in Exhibit C

to the ISA, by the number of loans in the portfolio, with an

---

common law." (quoting Long Island Sav. Bank, FSB v. United
States, 503 F.3d 1234, 1245 (Fed. Cir. 2007))).

[9] During negotiations with Freddie Mac, Doral instructed its
then-Senior Vice President of Investor Relations, Roberto Reyna,
to create a model projecting revenue, expenses, and profits
associated with servicing the Interim Portfolio for two years.

assumption of an annual thirteen percent decrease in the number of loans in the portfolio from year one to year two. Doral asserts that the sum of this formula, $10,876,954, encompasses the agreed damages under Section 1.1 for twenty-four months. Bearing in mind that Doral's actual damages, as calculated by Doral, total a mere $124,588, Doral's model mandates damages that are 87.3 times greater than Doral's own estimate of its actual damages. Notably, only five days elapsed between the execution of the ISA and the date of a TRO that prohibited Freddie Mac from transferring the portfolio to Doral. Moreover, given that the servicing had not yet begun, the Section 1.1 penalties were in their most extreme form (e.g., as compared to a hypothetical termination of the ISA after twenty-one months of servicing, which under Section 1.1 would have required Freddie Mac to pay Doral for only three months of servicing fees).

Furthermore, it appears from the record that Doral seeks an award without a reduction based on its estimated costs associated with servicing the loan portfolio. The district court pointed out that "incurred but unrecovered out of pocket costs can be determined and in fact, Doral makes such a claim in the amount of $124,588." J.A. 1538. We agree with the district court that Doral's forecast of its damages under Section 1.1, which would award Doral twenty-four months of servicing

compensation fees without any reduction for Doral's costs and expenses, amounts to an unenforceable penalty.

Thus, even if Section 1.1 is applied, and it is assumed that the "Effective Date" in Section 2.6 was triggered by the acts and deeds of Freddie Mac, Doral's forecast of damages pursuant to Doral's own model posits that Doral would reap a windfall exceeding $10 million in damages without any deduction for expenses.[10] Any such recovery would be grossly out of proportion to Doral's actual incurred costs of $124,588, and far in excess of what it might have reasonably expected to earn if it had actually incurred the significant cost of servicing more than 46,000 loans for a period of twenty-four months. In sum, Doral has failed to present a reasonable forecast of the loss caused by the breach. See Kraft Foods N. Am., Inc. v. Banner Eng'g Sales, Inc., 446 F. Supp. 2d 551, 573 (E.D.Va. 2006).

---

[10] In addition to expenses of $124,588 that Doral actually incurred in preparing to service the loan portfolio, it contends that it is entitled to service compensation fees of $10,876,954 for the twenty-four month period under the ISA, ancillary fees it would have earned from late and back check fees of $3,776,376 and the expense of remaining on hold after the TRO per Freddie Mac's request. Similar to its holding that the model was inadequate, the district court found Doral's figures with regards to these claims to be speculative and unsupported by the facts in the record.

23

III.

For the foregoing reasons, we affirm summary judgment as to Doral's breach of contract claim and damages entered in favor of Doral in the amount of $124,588.

<u>AFFIRMED</u>

DAVIS, Circuit Judge, dissenting:

The majority holds that § 1.1 of the parties' Interim Servicing Agreement ("ISA") constitutes a liquidated damages clause, and that the payment Freddie Mac agreed to make pursuant to that clause is an unenforceable penalty. My examination of the record persuades me, however, that Freddie Mac could satisfy its obligations under the ISA with any of several alternative means of performance. Accordingly, when viewed in light of the full scope of the parties' interests and incentives, § 1.1 is enforceable. Because § 1.1 is enforceable and because (as the district court concluded) there exists a genuine dispute as to whether Freddie Mac "determine[d] and communicate[d]" to Doral that Doral would be servicing the portfolio, I would vacate the judgment and remand the case for a trial on that question. Respectfully, therefore, I dissent.

I.

I begin by briefly describing the context in which the parties entered negotiations with each other. Sometime prior to 2008, Freddie Mac contracted with R&G Financial Mortgage Corporation (together with affiliated entities, "R&G") to service approximately 46,000 mortgage loans with a face value of $3.8 billion, secured by property located mostly in Puerto Rico. Pursuant to that agreement, R&G agreed to assume what is known

25

as the portfolio's "recourse obligation": in the event any of the loans in the portfolio were to default (or if some other "triggering event" were to occur), R&G would absorb the loss by repurchasing the delinquent loans and repaying Freddie Mac the associated value. In 2008, Freddie Mac itself calculated the value of the recourse obligation as $106 million; at any given time the entity assuming the recourse obligation carried an estimated liability of $106 million on its books. R&G's compensation for servicing the portfolio's loans and bearing the recourse obligation was set at a percentage of the borrower's monthly interest payments.

In mid-2008, with the nationwide mortgage crisis coming to a head, R&G faced serious financial difficulties. Freddie Mac, as the owner of the debt, worried that an R&G collapse would create two problems: (1) the portfolio would be left without a servicer and (2) the $106 million recourse obligation would revert to Freddie Mac. To ensure continuity in the servicing of the portfolio and prevent the recourse obligation from reverting to Freddie Mac, Freddie Mac began working to terminate R&G as servicer of the portfolio and to find another qualified servicer. One of the banks Freddie Mac approached to take R&G's place was Doral, a large bank with numerous branches in Puerto Rico.

Doral found the opportunity worth pursuing: as servicer, it would not only collect servicing fees but also would have substantial "cross-selling" opportunities, i.e., opportunities to sell other banking services to the huge number of new customers who would pass through Doral's bank branches to make their monthly payments. (Apparently, borrowers in Puerto Rico customarily make mortgage payments in person at banks, at least at rates substantially higher than in the mainland U.S.) Doral was concerned, however, that an increasing number of loans in the portfolio would default, and so recourse loomed as a particularly unsavory risk. Doral determined that the risk of assuming the recourse obligation would only be worthwhile if Freddie Mac would allow Doral to collect a greater percentage of the portfolio's revenue than apparently is typical.

Freddie Mac thought the premium Doral demanded was too high, but it desperately needed a servicer, and Doral -- a large financial institution with a substantial presence in Puerto Rico and over ten years of experience servicing Freddie Mac mortgages -- fit the bill. Thus, the parties agreed that Doral would be an "interim" servicer: it would service the loans but would not carry the recourse obligation. The recourse obligation, meanwhile, would revert to Freddie Mac. But Freddie Mac was also wary of the risk that more and more borrowers would default, forcing Freddie Mac to swallow losses potentially over $100

27

million. Thus, Freddie Mac, in exchange for allowing Doral to forgo the recourse obligation, demanded the ability to transfer the portfolio to a "permanent" servicer, i.e., one willing to accept the recourse obligation, at any time, so long as it gave Doral 30 days' notice.

Doral was willing to accept Freddie Mac's condition, but not without imposing its own condition. Freddie Mac was asking Doral to rapidly ramp up its operations to service a huge number of loans, all in a matter of days. Doral was incurring far too many up-front costs to give Freddie Mac carte blanche to terminate the ISA at will. If Freddie Mac were to terminate the ISA quickly, Doral's up-front expenditures would be for naught. As Doral's General Counsel explained, Doral "did not want to be a stopgap," allowing Freddie Mac to "shop around the portfolio" while Doral did "all the setup," only to have to "fire a lot of people" once Freddie Mac found a permanent servicer. J.A. 376. An early termination by Freddie Mac would also prevent Doral from "cross-selling" its other banking services -- a benefit that was crucial to making the ISA worthwhile for Doral in the first place.

Thus, the parties' risk-allocation calculus came down to the following: Freddie Mac wanted to retain the right to transfer the portfolio to a permanent servicer as soon as possible, in order to minimize the time during which it would

28

carry the recourse obligation. Accordingly, it proposed a month-to-month arrangement. Doral wanted to service the portfolio as long as possible in order to maximize its servicing fees and cross-selling opportunities. The question was how long Doral would need to service the portfolio in order to make entering the ISA economically worthwhile.

Doral instructed its then-Senior Vice President of Investor Relations, Roberto Reyna, to create a model projecting revenue and expenses associated with servicing the portfolio. Reyna determined that only with a guaranteed two-year servicing term would Freddie Mac's proposal be economically advantageous to Doral. Doral saw the two-year term as an essential, non-negotiable requirement of entering the ISA. A two-year deal would give Doral time to recoup the costs it would expend to service the loan, and, perhaps even more important, give it sufficient time to cross-sell its other banking services and thereby potentially make a profit. Doral estimated that over the course of the 24-month interim servicing term it would receive $10,876,954 in service compensation fees. It does not appear to have estimated the revenue it would generate from cross-selling to the portfolio's borrowers.

The compromise the parties reached was memorialized in § 1.1. Doral agreed to service the portfolio, and be compensated with a per-month, per-mortgage fee, "until such time as Freddie

29

Mac determines to transfer servicing" to a permanent servicer. J.A. 30, 45. The parties also agreed that, unless (a) "the Interim Portfolio is transferred pursuant to a court order," or (b) Doral's eligibility to sell or service mortgages were suspended or terminated, "the length of the interim servicing will not be less than 24 months." J.A. 30. In the crucial term at issue, which I will call the "early transfer provision," Freddie Mac agreed that, "[i]f the length of interim servicing is less than 24 months, then Freddie Mac will pay to Interim Servicer the total of 24 months of servicing compensation fee minus the number of months already billed by Interim Servicer." Id.

This carefully negotiated early-transfer provision struck a compromise between Doral's and Freddie Mac's concerns: it allowed Freddie Mac the flexibility to transfer the portfolio, at any time, to a permanent servicer (and thereby take the $106 million recourse obligation liability off its books), while ensuring that Doral would either (1) have 24 months to service the loans, collect servicing fees, and cross-sell other banking services, or (2) lose the cross-selling opportunities but still collect the servicing fees it would have received.

None of the early-transfer language would be relevant, however, if the ISA never went into effect. According to § 2.6,

30

the "Effective Date" for "commencement of the servicing of the Mortgages" was agreed to be the following:

> a date that Freddie Mac <u>determines and communicates</u> to the Interim Servicer <u>that Interim Servicer will be servicing the Interim Portfolio</u>. The Effective Date, when possible, will correspond to a date when Interim Servicer obtains the files for the Mortgages.

J.A. 33 (emphases added). Once the requisite "determin[ation] and communicat[ion]" were made, Doral's obligation to service the loans would commence, along with its right to collect servicing fees.

## II.

The primary question in this appeal is whether § 1.1 of the ISA is (1) an alternative-performance provision, (2) an enforceable liquidated damages clause, or (3) an unenforceable penalty. In holding that § 1.1 is an unenforceable penalty, the majority, in my view, oversteps its role and undermines a carefully negotiated compromise among sophisticated parties. I would hold that § 1.1 is enforceable as an alternative-performance provision. The second question presented, which the majority does not reach (and as to which Freddie Mac has not filed a cross-appeal), is whether a reasonable jury could find that Freddie Mac "determine[d] and communicate[d]" to Doral that Doral "will be servicing the Interim Portfolio."

31

A.

The first component of whether § 1.1 is enforceable is whether it is an alternative-performance clause or a liquidated damages clause. An alternative-performance provision is one in which "either one of the two alternative performances is to be given by the promisor and received by the promisee as the agreed exchange." 11-58 Corbin on Contracts § 58:18. A liquidated damages clause is one that fixes an amount of damages to be paid in the event of "breach." Restatement (Second) of Contracts § 356 (1981). If ISA § 1.1 is an alternative performance provision, it is enforceable according to its terms. 24 Richard A. Lord, Williston on Contracts § 65:7 (4th ed. 2002). If it is a liquidated damages provision, it still is enforceable, but only if the liquidated amount is "reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss." Restatement (Second) of Contracts § 356.

To determine whether a contract provides for alternative performances or liquidated damages, we look to "the substance of the agreement." Id. § 356, cmt. c. As the majority correctly notes, one distinction between alternative performances and liquidated damages is whether the provision "looks to a continuation of the relationship between the parties, rather than its termination," or instead serves as a stipulated

32

calculation of damages by the parties "as a remedy for <u>breach</u>." Williston § 65:7 (emphasis added); <u>see also</u> 11-58 Joseph M. Perillo ed., Corbin on Contracts § 58.1 (a liquidated damages provision "determine[s] in advance what damages will be assessed in the event of a breach"). In addition, crucial factors in assessing the distinction between these two types of contractual provisions include "[1] whether the promisor had a 'true option' on which alternative to perform, [2] whether the money payment is equivalent to performance of the option, and [3] the relative values of the performances." 14 Williston on Contracts § 42:10; <u>see also</u> Restatement (Second) of Contracts § 356 cmt. c ("In determining whether a contract is one for alternative performances, the relative value of the alternatives may be decisive."). For a contractual provision to be one for alternative performance, at the time the parties entered the contract there must have been "a reasonable relationship between the alternatives." 14 Williston on Contracts § 42:10. That is, the promisor must have "conceived [it to be] possible that at the time fixed for performance, either alternative might prove the more desirable." <u>Id.</u>

The fact that "one of the alternative performances is the payment of a liquidated sum of money" does not necessarily transform an alternative-performance clause into a liquidated damages clause. 11-58 Corbin on Contracts § 58:18; <u>see also</u> 24

33

Williston on Contracts § 65:7, at 263 (The fact that "one of the alternative performances is the payment of a fixed sum of money" does not "alone . . . make the contract one for single performance with a liquidated damage provision for a breach."). Indeed, "most instances of alternative contracts involve the payment of money as an alternative to actual conduct in carrying out the terms of an agreement." Matter of Cmty. Med. Ctr., 623 F.2d 864, 867 (3d Cir. 1980). An alternative performance provision will not be enforced, however, if it is a "disguised" penalty. Restatement (Second) of Contracts § 356 cmt. c.

B.

Doral argues § 1.1 is a proper alternative-performance clause because it allowed Freddie Mac to perform its obligations under the ISA in either of two ways: (1) keeping the portfolio with Doral for the entire 24-month period, at the cost of having to bear the potential $106 million default risk for the entire 24 months, while compensating Doral with monthly servicing fees, or (2) transferring the portfolio to a permanent servicer at some point during the 24 months, relieving Freddie Mac of the $106 million default risk, and compensating Doral with the equivalent of the servicing fees Doral would have earned during the remainder of the 24 months. I agree. In my view, Freddie Mac had a true option on which alternative to perform, as the values of the two options were reasonably equivalent and either option

34

could have proven to be the more desirable one depending on extrinsic factors.[11]

There is no dispute that if Freddie Mac were to transfer the portfolio early (i.e., if it chose the second option), it

---

[11] The majority declines to explain why it believes Freddie Mac did not have a true choice between two plausibly desirable options. Instead, my good colleagues apparently believe that, assuming § 1.1 is enforceable, the express exception in § 1.1, which would apply if Freddie Mac had been "ordered by court to transfer the Interim Portfolio from the Interim Servicer before the expiration of 24 months," J.A. 30, excused Freddie Mac from making the early-transfer payment. The majority asserts that "of course" the Puerto Rico court's temporary restraining order constitutes such a court order. Maj. Op. at 17 n.5. But Freddie Mac does not argue on appeal that the "ordered-by-court" exception excused its performance under § 1.1. Rather, its argument related to § 1.1 is entirely and solely that (1) § 1.1 does not apply because there was no "determin[ation]" and "communicat[ion]" under § 2.6, or, alternatively, (2) § 1.1 is unenforceable. Moreover, although Freddie Mac raised in the district court the argument now relied on by the majority, the district court easily (and correctly, in my view) rejected it:

> While Freddie Mac admits that no such court order to transfer the loan portfolio was ever issued because R & G never transferred the files to Doral in the first place, Freddie Mac contends the TRO should be considered the same as a court order transferring the files away from Doral. This argument fails as a matter of law . . . . [A]s Freddie Mac concedes, the TRO did not transfer the portfolio from Doral. This Court will not assume that the TRO is the same as an order transferring the portfolio for the purposes of Section 1.1. In this regard, it is impossible to determine what the district court issuing the TRO would have done had the portfolio, in fact, already been transferred to Doral.

Doral Bank PR v. Federal Home Loan Mortgage Corp., 2010 WL 3984667, *5 (E.D. Va. Oct. 7, 2010)(emphasis added). Therefore, the majority's reliance on the "ordered-by-court" exception to avoid the requisite economic analysis is misplaced.

would end up spending more money on the servicing of the portfolio than it would have otherwise. For example, if it were to transfer after 10 months, it would still owe Doral 14 months' worth of servicing fees but would also have to pay 14 months of servicing fees to the new permanent servicer. But, crucially, an early transfer would not necessarily be more expensive to Freddie Mac when one considers, as one should, the $106 million recourse obligation. Every month the recourse obligation remained on Freddie Mac's books, the company faced the risk that borrowers with many millions of dollars in loans would default, and Freddie Mac would bear the full brunt of those losses. This risk was palpable in mid-2008, just as the proverbial housing bubble was beginning to burst. At any given time during Doral's 24-month interim servicing term, Freddie Mac could rationally have decided that invoking the early transfer clause in § 1.1 would be in its best interests, even if doing so would mean essentially paying double servicing fees during the remainder of the 24 months.

When viewed in these terms, I conclude that Freddie Mac had a "true option" to elect either to leave the portfolio with Doral for the full 24 months or to transfer it to a permanent servicer earlier. When one compares "the relative values of the performances," it is clear that the "money payment" pursuant to § 1.1 (the value of remaining servicing fees) is reasonably

36

equivalent to "performance of the option" (leaving the portfolio with Doral while retaining the recourse obligation), precisely because it was in Freddie Mac's interest to unload the recourse obligation as soon as possible.

The majority places apparently dispositive weight on three facts: (1) that the early-transfer payment turned out to be 87.3 times larger than what the majority sees as Doral's "actual damages," i.e., the money Doral expended to prepare to service the 46,000 loans in the portfolio; (2) that the early transfer payment was to be the full amount Freddie Mac would have paid Doral in servicing fees, with no deduction for the expenses Doral would have incurred if it had continued to service the loans (and would save if Freddie Mac were to transfer the portfolio early); and (3) that § 1.1 "would apply only if Freddie Mac were to terminate the ISA" by transferring the portfolio to a permanent servicer, thereby ending the parties' contractual relationship. Maj. Op. at 17–18. But these facts do not render § 1.1 unenforceable, for the following reasons.

First, the ratio between the expenses Doral incurred in preparing to service the portfolio and the servicing fees it would have collected over the 24 months is not relevant to whether <u>Freddie Mac had a true option between two plausibly beneficial options</u>. It is true $10.9 million is much larger than the $124,588 Doral actually expended. But when Freddie Mac

37

arguably transferred the portfolio back to R&G ("arguably" because there is a genuine dispute whether Freddie Mac determined and communicated that Doral would be servicing the portfolio, see infra), Freddie Mac benefited by avoiding any more time carrying the $106 million recourse obligation. The question whether § 1.1 provides for alternative performances is assessed from Freddie Mac's perspective, because Freddie Mac was the "promisor" with respect to the early transfer payment. See 14 Williston on Contracts § 42:10 (looking to whether "the promisor had a 'true option' on which alternative to perform"); 11-58 Corbin on Contracts § 58:18 (describing an alternative-performance contract as one in which "either one of the two alternative performances is to be given by the promisor and received by the promisee as the agreed exchange"). The amount Doral expended on preparations is immaterial to the relative attractiveness to Freddie Mac, the promisor, of the two alternative ways it could discharge its obligations under the ISA.

Second, even if the relative benefit of the options to Doral were relevant, Doral would not necessarily have been better off with an early transfer. While an early transfer would allow Doral to collect its servicing fees without incurring expenses from actually servicing the portfolio, an early transfer would also have stripped Doral of the potentially very

38

significant cross-selling opportunities it would have had during the remainder of the 24 months. Freddie Mac does not dispute that a substantial portion of the borrowers in the portfolio were not existing Doral customers, and that Doral's new cross-selling opportunities would have led to new business for Doral. Indeed, the influx of new customers would have increased Doral's mortgage servicing business by nearly one-third. Thus, to the extent the majority insists on considering the relative benefit of the options to Doral, the relevant comparison is not between the $124,588 in preparation expenses and the $10.9 million early-transfer payment. Rather, it is between (1) the expenses Doral would have incurred during a particular portion of the 24 months, and (2) the revenue Doral would have received from cross-selling during those months. There is every reason to believe the parties saw the value of these two items as roughly equivalent. Therefore, viewed not only from Freddie Mac's perspective but from Doral's as well, Freddie Mac's two alternative means of performance were reasonably equivalent.

Third, the ISA expressly grants Freddie Mac the option to transfer the portfolio to a permanent servicer within the 24 months. A liquidated damages clause stipulates damages in the event of a "breach" by one of the parties. Restatement (Second) of Contracts § 356. Because the ISA expressly allows Freddie Mac to transfer the portfolio early, an early transfer would not

39

constitute a breach. This is so even though, as the majority notes, Freddie Mac's invocation of its early-transfer option would essentially terminate "the relationship between the parties." Maj. Op. at 17 (quoting Williston § 65:7). While the continuation of a contractual relationship can help demonstrate that a particular performance is a true alternative rather than liquidated damages, see, e.g., Cmty. Med. Ctr., 623 F.2d at 865,[12] such a continuation is not necessary. See, e.g., River East Plaza, LLC v. Variable Annuity Life Ins. Co., 498 F.3d 718, 724 (7th Cir. 2007) (interpreting a contract as one for alternative performance even though the promisor's election of one option effectively terminated the parties' contractual relationship)[13]; Las Vegas Sands Corp. v. Ace Gaming, LLC, 713 F.

---

[12] In Community Medical Center, the contract at issue was for the provision of information technology services to the Center. 623 F.2d at 865. The Center agreed to either (a) pay InfoMed, the IT company, on a monthly basis for the services it provided, which were around $3,400 on average, or (b) pay a minimum monthly fee of $1,500. Id. at 866. The Third Circuit held that the $1,500 minimum monthly fee was a true alternative performance, in part because the fee "look[ed] more to a continuance of the relationship between Info Med and the debtor rather than termination." Id. at 867. The court did not, however, indicate that the continuance of the relationship was a necessary condition to finding the contract to be one for alternative performances.

[13] In River East, a development company (River East), took out a $12 million loan to build a large retail store. 498 F.3d at 719. The loan agreement included a "yield maintenance prepayment clause," which provided that, in the event River East chose to pre-pay the loan, it would have to pay back not only
(Continued)

40

Supp. 2d 427 (D.N.J. 2010) (upholding as an alternative-performance contract a trademark-licensing agreement that provided for the contract to continue until the year 2086, but permitted early termination with the condition that the terminating party would nevertheless pay the licensing fees due until the 14th anniversary of the contract plus an additional one-year "termination fee").

For these reasons, I would hold that § 1.1 is a true alternative-performance provision that must be enforced if the

---

the principal but also the return the lender would have received if it had invested the remaining balance in Treasuries over the remaining years on the loan. Id. River East pre-paid and tried to avoid paying the pre-payment amount, calling it an unenforceable "penalty." The Seventh Circuit rejected that argument, and conducted a detailed analysis of the "relative value of the alternatives" from the perspective of the parties at the time they negotiated the loan agreement. Id. at 722-23 (applying Restatement (Second) of Contracts § 356). Because River East could achieve a substantial benefit by pre-paying, even though it would also have to pay the pre-payment penalty, the court concluded that River East had a true choice between two options; the eventual relative value of the two alternatives (and thereby River East's eventual decision whether to refinance) would depend entirely on whether interest rates increased or decreased. The clause was not one whose "sole purpose is to secure performance of the contract." Id. at 723. Therefore, the alternative-performance clause was enforceable according to its terms, notwithstanding the fact that it operated to terminate the parties' relationship.

condition precedent (the determination and communication from Freddie Mac) occurred.[14]

## C.

Because I would hold that the early-transfer provision in § 1.1 is enforceable, I simply highlight the district court's treatment of the issue of whether the parties' obligations under the ISA became effective. The district court concluded, correctly in my view, that there was a genuine dispute on this issue.[15] Manifestly, a reasonable jury could reasonably find that Freddie Mac "determine[d] and communicate[d]" to Doral that

---

[14] In the alternative, even if § 1.1 is analyzed as a liquidated damages clause, it would be enforceable for largely the same reasons. Under federal common law, a liquidated damages provision is enforceable if, at the time of contracting, (1) "the harm that would be caused by a breach is difficult to estimate" and (2) the liquidated amount is "a reasonable forecast of the loss that may be caused by the breach." DJ Mfg. Corp. v. United States, 86 F.3d 1130, 1133 (Fed. Cir. 1996); see also O'Brian v. Langley School, 507 S.E.2d 363, 365 (Va. 1998) (applying the same test under Virginia law). As discussed, one aspect of the harm to Doral of an early transfer was the loss of cross-selling opportunities, the precise value of which was very difficult to calculate. Moreover, the early-transfer payment was a reasonable forecast of the value of those opportunities. Although § 1.1 does not deduct the amount Doral would have expended over the remaining months, it is reasonable to conclude that the parties considered Doral's servicing expenses as roughly equivalent to the value of Doral's cross-selling opportunities. Therefore, in my view, even construed as a liquidated damages clause, § 1.1 is enforceable.

[15] I agree with the majority that the "Effective Date" described in § 2.6 is distinct from the effective date clause on the face of the ISA.

42

Doral would "be servicing the Interim Portfolio." Accordingly, I would remand this case for trial.

As the majority explains, on Friday, July 11, 2008, Freddie Mac instructed Doral to come to the R&G offices to facilitate transfer of loan files to Doral on the following Monday. That same day, a Freddie Mac team arrived in Puerto Rico intending to terminate R&G's eligibility to sell loans to, and service loans for, Freddie Mac. Freddie Mac also instructed Doral's Vice President of Mortgage Servicing to prepare for the transfer of certain physical mortgage files from R&G and to have personnel, information technology support, and transportation support ready by Monday morning. Over the weekend (July 12-13), Freddie Mac's representatives in Puerto Rico worked together with Doral staff at Doral's headquarters to set in place the necessary elements of servicing. Freddie Mac provided Doral with electronic files containing information about the loans in the Interim Portfolio, including detailed personal and financial information about the mortgage borrowers. Furthermore, Freddie Mac's representative told Doral on Saturday, July 12, that Freddie Mac anticipated obtaining the R&G files in three calendar days.

On the morning of July 14, representatives of the two companies met at Doral's offices in San Juan to discuss, as Freddie Mac characterized it, the "anticipated initiation of the transfer of R&G's files (including data) to Doral." J.A. 143. In

43

addition, Freddie Mac provided Doral with an electronic copy of the "trial balance data," the loan data for the 46,132 Freddie Mac mortgage loans then constituting the Interim Portfolio. J.A. 208, 1848-59. According to Doral, upon receiving this data, together with the loan data received over the weekend, Doral had all the information it needed to begin servicing the portfolio by sending welcome letters to borrowers, accepting loan payments, performing reconciliations, and making remittances to Freddie Mac. Furthermore, Freddie Mac's internal documents, created prior to the evening of July 15, indicate that Freddie Mac had "already assigned the servicing" to Doral and refer to Doral as "the Interim Servicer." J.A. 275-78, 534-36.

Based on this evidence, a reasonable jury could conclude that Freddie Mac had "determine[d]" to transfer the servicing rights to Doral, and had effectively "communicated" that determination to Doral. Only after the temporary restraining order enjoined Freddie Mac from transferring the portfolio to Doral did Freddie Mac show any intention other than that Doral imminently would become the interim servicer, and should make every effort to prepare to begin servicing the portfolio.

## III.

For these reasons, I would vacate the grant of summary judgment to Freddie Mac and remand this action for trial.

44